SEMINOLE PIPELINE COMPANY, MAPCO, INC., and Mid–america Pipeline Company, Appellants,

v.

BROAD LEAF PARTNERS, INC., Pierre Cavaness, Carolyn Cavaness, Betty Crawford, Dr. Robert Hardie, Herbert Klatte, Esther Mae Klatte, James Jeffress, Sonya Jeffress, James Nitsch, Lois Nitsch, Charles Nitsch, Roy White, Dorothy White, David Schulz, Vicki Schulz, W.W. O'Donnell, Regina O'Donnell, W.H. Tonn, III, and Jeanne Tonn, as Independent Executrix of the Estate of W.H. Tonn, Appellees.

No. 14–96–00825–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 15, 1998.

Kevin F. Risley, Frank W. Gerold, Houston, William Charles Powers, Austin, for appellants.

Joseph A. Garnett, Lauren L. Beck, Houston, George Chandler, Lufkin, Richard Sheehy, Walter Zivley, Michael C. Clark, Houston, for appellees.

Before YATES, HUDSON and FOWLER, JJ.

## OPINION

HUDSON, Justice.

This is an appeal from a suit arising out of an explosion at an underground salt-dome storage facility and pipeline pumping station. Twenty-two plaintiffs sued appellants, Seminole Pipeline Company, MAPCO, Incorporated, and Mid–America Pipeline, for damages resulting from the explosion.[1]

On appellants' motion, the trial was bifurcated. Phase one of the trial resolved liability issues on actual and punitive damages, and determined the amount of the plaintiff's compensatory damages. The jury found each of the defendants (1) was negligent; (2) created a nuisance by their use of the property; (3) was grossly negligent; (4) acted with malice; (5) proximately caused the plaintiffs' damages by their negligence; and (6) created a permanent nuisance. Also finding appellants jointly and severally liable for the total amount of plaintiffs' damages, the jury awarded appellees approximately 5.4 million dollars in actual damages for property damage and mental anguish. In phase two, the jury assessed punitive damages and awarded appellees 46 million dollars in exemplary damages against each appellant.

After several post-verdict hearings, the trial court reduced the exemplary damage award from 46 million dollars to four times the amount of actual damages, or approximately 21.6 million dollars. The trial court rendered judgment and the defendants appealed, raising forty-six points of error. A number of plaintiffs filed cross-appeals.

On February 27, 1998, appellants and ten of the appellees, Pierre Cavaness, Carolyn Cavaness, Betty Crawford, Individually and as Trustee of the Betty A. Crawford Trust, Robert Hardie, James Jeffress, Sonya Jeffress, Charles E. Nitsch, James A. Nitsch, Lois B. Nitsch, and David Schulz, filed a joint motion to dismiss all claims between them on appeal. We granted their motion and issued an opinion on March 26, 1998. On March 27, 1998, appellants and six appellees, Broad Leaf Partners, Ltd., Herbert Klatte, Esther Mae Klatte, Roy White, Dorothy White, and Vicki Schulz, also filed a joint motion to dismiss. On April 30, 1998, this court granted the motion and ordered all points of error asserted by appellants against the settling appellees and all cross-points of error asserted by the settling appellees dismissed.

Twenty-two of appellants' points of error remain for our consideration. Appellants contend (1) the evidence is legally and factually insufficient to support the jury's finding of negligence and gross negligence, (2) the trial court misapplied the statutory cap on punitive damages and such damages are excessive, (3) the award for mental anguish is not supported by legally or factually sufficient evidence and is excessive, (4) the issue of mental anguish was improperly submitted to the jury, and (5) the trial court erred in calculating the amount of prejudgment interest. Appellees, W.W. O'Donnell, Regina O'Donnell, W.H. Tonn, III, and Jeanne Tonn, as Executrix of the Estate of W.H. Tonn, II, bring seven cross-points. We affirm the judgment of the trial court in part and also reverse and remand in part.

---

1. Two plaintiffs, Walter and Beryl Carss, settled with the defendants prior to this appeal.

## I. Construction and History of the Brenham Cavern

As common carrier pipeline companies, appellants transport ethane, propane, butane and other natural gas liquids (also known as NGL or LPG) through their pipeline networks. These products are actually gases, but they are most efficiently transported and stored while in a liquid state. To maintain these products in liquid form they must either be compressed or cooled. If they are not pressurized, these liquids will quickly revert back into a gaseous state at normal temperatures.[2] To enhance their ability to deliver an uninterrupted supply of natural gas liquids, appellants have constructed a series of underground reservoirs into which they can divert and maintain these products under pressure. When appellants' supply of natural gas liquids exceeds demand, the excess product is diverted into an underground cavern. Likewise, when demand exceeds the supply, appellants make up the difference by drawing from their reserves.

Appellants began construction of the Brenham saltdome cavern storage facility in 1980, by a procedure known as "washing." Fresh water was injected into an underground salt formation and the resulting brine was extracted. By this method, appellants "washed out" a huge subterranean cavern. In 1981, appellants obtained a permit from the Texas Railroad Commission to use the cavern as a storage facility for up to 150,000 barrels of natural gas liquids.

2. At atmospheric pressure, for example, propane will begin boiling at −44°F. If the pressure is increased to 94 psig (pounds per square inch gauge), the boiling point rises to 60°F. Likewise, if the pressure is increased to 174 psig, propane does not begin boiling until the temperature reaches 100°F.

To/From Brine Pond

To/From Product Pipeline

Brine

Salt

Product

SALT

# Typical Liquid Product Storage

Normally, natural gas liquids stored in saltdome caverns "float" on an underground lake of heavy brine where they are safely contained under pressure.[3] When additional natural gas liquids are injected into the cavern, brine is displaced and forced to the surface through a pipe known as the "brine string." The excess brine is collected in a large surface pit. When natural gas liquids are extracted from the reservoir, brine from the surface pit refills the cavern and keeps the remaining product under pressure. Thus, while the product inventory may vary from day to day, there remains an unbroken "string of brine" linking the brine pit on the surface with the brine lake at the bottom of

3. Brine has more than twice the density of liquid propane.

the subterranean cavern. The weight of the brine within the brine string maintains pressure on the cavern and prevents the stored natural gas liquids from vaporizing and escaping to the surface.

If incoming product pushes the brine level below the bottom of the brine string, natural gas liquids will flow through the brine string to the surface. As the column of brine is displaced by product in the brine string, the pressure in the reservoir falls, natural gas liquids within the brine string and reservoir vaporize, and a "geyser" of escaping gas spews from the brine pit. As the pressure exerted on the product lessens, the flow of gas increases, and, if the path to the surface is not closed by mechanical means, all of the product inventory in the cavern will vaporize and escape into the atmosphere. When mixed with oxygen, NGL vapor is extremely flammable and capable of explosive ignition.[4] Because of this potential hazard, the cavern operator must carefully monitor the facility's inventory to insure that it never exceeds the capacity of the reservoir.

To prevent product escaping in the event of an accidental overflow, appellants equipped the brine string at the Brenham cavern with a pressure sensing device called a Barksdale switch. Theoretically, if gas escaped through the brine string, the Barksdale switch would detect the drop in pressure and activate a trip check system. Safety mechanisms would then automatically seal the cavern and prevent additional vapor from escaping into the air. The facility also had between 20 and 25 hazardous gas sensors around the facility to detect any escaping vapor. These sensors were connected to a trip check alarm inside the facility's office. Appellants also installed monitors to detect changes in cavern pressure, and to indicate the volume of product entering or leaving the cavern. Moreover, the hazardous gas sensors were monitored 24 hours a day in Mid–America's home office in Tulsa, Oklahoma by means of a computer network.

From 1981 until the date of the explosion, Seminole periodically increased the facility's storage capacity by "washing" the cavern with fresh water and further eroding the salt dome. Brine that could not be stored in surface holding pits was sold to outside vendors and transported off site. By November of 1991, Seminole had increased the Brenham cavern's storage capacity from 150,000 to 336,600 barrels. Seminole informed the Texas Railroad Commission of its new storage capacity and set the working capacity of the cavern at 300,000 barrels, 90% of the actual calculated capacity.

On March 31, 1992, Troy Boisen, a Mid–American employee living in Brenham, conducted a routine check of the trip check system, and found it to be operating normally.

## II. THE ACCIDENT

On April 7, 1992, at approximately 6:09 a.m., a hazardous gas alarm sounded at Mid–America's office in Tulsa, Oklahoma. At 6:10 a.m., Dwight Aryain, the dispatcher monitoring the facility, called Boisen and informed him that a "hazardous gas fault" alarm had been activated at the cavern. Aryain asked Boisen to drive to the facility to determine the source of the signal. Boisen arose, took a shower, dressed, and stopped at a convenience store for a soft drink. He arrived at the cavern approximately 20 minutes after receiving the call.

Boisen immediately observed that a large cloud of "fog" had engulfed the facility.[5] When Boisen attempted to turn off the engine of his diesel pickup, the motor continued to run on the airborne gas vapor. Concluding there was probably not enough oxygen in the air to sustain him long enough to get to the facility's manual shut-off valve, Boisen retreated to the house of some nearby residents. From there, Boisen telephoned the Tulsa dispatch office and advised it of the hazardous gas situation. He then called his supervisor, Ron Ritchey. Ritchey ordered

---

4. One gallon of vaporized propane, mixed with air, has the equivalent energy of 13 pounds of TNT.

5. Seminole later estimated that three to five thousand barrels of natural gas liquids escaped to the surface and were released into the atmosphere.

Boisen to evacuate the area, retreat to a safe distance, and not to enter the vapor cloud.

Boisen instructed the residents of the house to leave the area. Disregarding his personal safety and Ritchey's explicit instructions, Boisen entered the vapor cloud and attempted to reach the main facility with the intention of shutting off the gas. Boisen encountered two other Seminole employees at the entrance of the facility, and the three men attempted to reach the main shut-off valve. The concentration of gas, however, was too great, and the men were forced to abandon the effort because the safety trailer which housed their emergency breathing apparatus and equipment necessary to perform the shut down was ninety miles away in Sugar Land. Shortly thereafter, Boisen noticed the headlights of a car disappear into the vapor cloud. Seconds later, the gas cloud exploded with the estimated force of a three-kiloton bomb.[6]

## III. MAPCO'S LIABILITY

The jury found the explosion was proximately caused by the negligence of all three defendants. Mid–America and Seminole do not contest this finding. MAPCO, however, claims it was not negligent, and in its eleventh point of error, contends the evidence is legally and factually insufficient to support the jury's finding in this regard. While Mid–America and Seminole concede they were responsible for the overfill, MAPCO claims it did not own or control the Brenham cavern, and it denies all liability for the incident. Appellees, on the other hand, argue that MAPCO possessed sufficient control over the construction and operation of the Brenham

facility to permit the jury to infer its negligence under the doctrine of *res ipsa loquitur.*

When both legal and factual sufficiency challenges are raised on appeal, the court must first examine the legal sufficiency of the evidence. *See Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981) (per curiam). In reviewing a challenge to the legal sufficiency of the evidence, an appellate court considers only the evidence and inferences tending to support the trial court's findings and disregards all evidence and inferences to the contrary. *See Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992).

■ *Res ipsa loquitur* is applicable only when two factors are present: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence; and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant. *See Haddock v. Arnspiger,* 793 S.W.2d 948, 950 (Tex.1990). Here, the record indicates MAPCO's direct involvement in the day-to-day operations of the cavern was extremely limited. Although MAPCO employees did perform occasional inspections of the facility inventory sheets,[7] we do not find this fact alone to be the type of control necessary to impose liability under the doctrine of *res ipsa loquitur.*

■ Appellees also attempt, however, to blend the doctrines of *alter ego* and *res ipso loquitur* and contend that MAPCO's corporate structure and operations were so intertwined with those of Mid–America and Seminole that it effectively "controlled" cavern operations. For example, MAPCO is the

---

**6.** A retired Air Force Colonel with an advanced degree in nuclear physics, Walter Carss, was an eye witness to the explosion. Carss said the countryside was suddenly illuminated by a brilliant flash of light. Turning in his chair, Carss looked in the direction of the cavern. There, he observed an enormous fireball billowing skyward. As the fireball cooled, it began to turn into a huge pillar of grey smoke. Carss then noticed a visible shock wave racing across the rural landscape. He watched the shock wave rip limbs off trees and flatten the grass as it inexorably rushed across the creek and pastures. When the shock wave reached him, Carss reported hearing "the loudest noise that I have ever heard." Although his home was more than a

mile from the cavern, Carss found himself surrounded by flying glass and insulation. The brick wall on the side of the house nearest the blast was shattered and the doors, windows, and their casings were blown out of the wall. The roof of the house was also badly damaged.

**7.** MAPCO exercised "spot checks" of the records of various MAPCO entities, including the Brenham cavern. In August of 1986, for example, MAPCO's auditors checked thirteen of the cavern's inventory sheets and found significant arithmetic errors on five sheets. The auditors alerted Seminole and Mid–America to these errors.

sole shareholder of MAPCO Natural Gas Liquids Incorporated. MAPCO NGL, in turn, owns all the stock of Mid–America Pipeline Company. The senior vice-president of MAPCO, NGL, Robert Thomas Cronk, Jr., also serves as the senior vice-president of Seminole Pipeline Company. Mid–America supplies all of Seminole's employees and owns 80% of its stock. Fred Isaacs, President of Seminole, is paid directly by MAPCO.[8] Isaacs also admitted he was responsible for the construction of the Brenham cavern and its safety controls. In other words, Mid–America is the business entity that conducts MAPCO's inter-state business and Seminole is the business entity which conducts MAPCO's intra-state business in Texas. All three appellants are Oklahoma-based corporations located at the same address.

■ As a general rule, a parent corporation is not liable for torts committed by its subsidiaries. *See Lucas v. Texas Indus., Inc.,* 696 S.W.2d 372, 374 (Tex.1984). However, we will disregard the corporate fiction (1) when the fiction is used as a means of perpetrating fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where the corporate fiction is resorted to as a means of evading an existing legal obligation; (4) where the corporate fiction is employed to achieve or perpetrate a monopoly; (5) where the corporate fiction is used to circumvent a statute; or (6) where the corporate fiction is relied upon as a protection of crime or to justify wrong. *See Castleberry v. Branscum,* 721 S.W.2d 270, 272 (Tex.1986).

■ Here, the record demonstrates the three defendant corporations were closely tied to one another, but a subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of control that stock ownership gives to stockholders.

*See McFee v. Chevron Int'l Oil Co., Inc.,* 753 S.W.2d 469 (Tex.App.-Houston [1st Dist.] 1988, no writ). There must be something more than mere unity of financial interest, ownership and control before we will make the parent liable for the subsidiary's tort. *See Lucas,* 696 S.W.2d at 374. In short, absent a showing of wrongdoing on the part of the parent corporation, Texas courts have refused to make the parent liable for its subsidiary's torts. *See Lubrizol v. Cardinal Constr.,* 868 F.2d 767, 771 (5th Cir.1989). Accordingly, we reject appellees contention that MAPCO's corporate structure demonstrates it "controlled" cavern operations.

■ Appellees contend, however, that appellants' attorneys made certain admissions regarding the cause of the explosion. They claim almost no effort was made during trial to distinguish MAPCO from Mid–America or Seminole. In fact, all three defendants were represented by the same counsel and during voir dire, appellants' lead trial counsel introduced everyone on the defense team and made the following comments during his examination of the venire:

> Immediately after this accident—this explosion—we really didn't think that it was our responsibility. But as events unfolded and as the examination of what occurred did ensue, we have determined that it was caused by an overfill of the cavern. So whatever evidence is brought in here to determine that there was an overfill, it is really not addressing an issue that's in contest here. We overfilled the cavern. Gas escaped from the cavern and it was ignited, and there was this terrible explosion. That explosion that we regret.

> We didn't mean to do wrong. But unfortunately, we did.

> * * *

> ... [T]he explosion came from our cavern.

---

8. At the time of trial, Isaacs was a MAPCO retiree, but was still on the company's payroll as a contract consultant and served as president of Seminole Pipeline. Neither Isaacs, nor any other employee working at the Brenham facility, is paid by Seminole. MAPCO is compensated for services it renders to Seminole through Mid–America. Mid–America bills Seminole for its direct costs and then charges it an administrative fee for providing personnel and equipment to operate its facilities.

We have learned our lesson. We have indicated in this Court that we were the parties responsible for that overfill. . . .

\* \* \*

We have realized our mistakes. And in this case, we are ready to pay for the damages that we have caused.

This theme reappeared during defense counsel's closing statements to the jury when he said:

When we were in court before on opening statement, I told you what our story— what our theme—was that we wanted to get over to you. It was simply this: That we didn't mean to do wrong, but unfortunately we did. We learned our lesson, changed our ways, but weren't given a chance to keep the cavern open. We accept our mistakes and we are ready to pay for damage we caused. But the plaintiffs want us to pay for things we didn't do. And that's why we think the plaintiffs' requests for damages are unfair.

MAPCO argues that counsel's statements were "merely a recognition that the cavern was overfilled," and not an admission of liability. Citing to *Carroll Instrument Co. v. B.W.B. Controls, Inc.*, 677 S.W.2d 654, 659 (Tex.App.-Houston [lst Dist.] 1984, no writ), they also argue that MAPCO's counsel did not make any binding judicial admissions and that if he did, Royce M. Parr, General Counsel and secretary for MAPCO NGL, unambiguously refuted those statements. Parr testified that he was present at trial, not as a company representative, but as an attorney on behalf for MAPCO Natural Gas Liquids, Inc., Mid–America Pipeline Company, and Seminole Pipeline Company. When asked whether the companies he was representing "admitted negligence for the damages sustained by [plaintiffs]," Parr responded "They have not."

The record also reveals that appellants' counsel's remarks during voir dire were prefaced with, "Let me explain *Seminole's* position." (Emphasis added). Likewise, counsel's closing argument made reference to his opening statement where, again, his comments seem to have been directed toward Seminole. Before admitting "we" overfilled the cavern, counsel told the jury about the 36,000 barrel "safety factor" and said:

Now that was the thinking of *Seminole*, that they were providing a cushion. That's what was in their mind. That's what they were conscious of.

The truth is, the day before the explosion *Seminole* had no idea that they were that close or that they were anywhere near the safety—safe working capacity of the cavern.

(Emphasis added).

■■■■ A judicial admission results when a party makes a statement of fact which conclusively disproves a right of recovery or defense he currently asserts. *See H.E. Butt Grocery Co. v. Pais*, 955 S.W.2d 384, 389 (Tex.App.-San Antonio 1997, no writ) (*citing Gevinson v. Manhattan Constr. Co. of Okl.*, 449 S.W.2d 458, 466 (Tex.1969)). A judicial admission must be (1) made in the course of a judicial proceeding; (2) contrary to an essential fact for the party's recovery [or defense]; (3) deliberate, clear and unequivocal; (4) related to a fact upon which judgment for the opposing party could be based; and (5) enforcing the admission would be consistent with public policy. *See Sepulveda v. Krishnan*, 839 S.W.2d 132, 135 (Tex.App.-Corpus Christi 1992), *aff'd*, 916 S.W.2d 478 (Tex. 1995). Counsel's statements on behalf of his client will be deemed judicial admissions only if they satisfy the five criteria listed above. *See Sepulveda*, 839 S.W.2d at 135; *see also Shafer v. Bedard*, 761 S.W.2d 126, 129–30 (Tex.App.-Dallas 1988, no writ); *Hochmetal Africa (PTY), Ltd. v. Metals, Inc.*, 566 S.W.2d 715, 718 (Tex.Civ.App.-Corpus Christi 1978, no writ); *Rosse v. Northern Pump Co.*, 353 S.W.2d 287, 292 (Tex.Civ.App.-Austin 1962, writ ref'd n.r.e.).

The principle of binding a party by his judicial admission should be applied with caution because the effect is that the declarant swears himself out of court. *See Esteve Cotton Co. v. Hancock*, 539 S.W.2d 145, 157 (Tex.Civ.App.-Amarillo 1976, writ ref'd n.r.e.). The statements made here were, at best, equivocal. We find the character of the statements do not rise to the level of "judicial admissions."

■ In the event that MAPCO's liability cannot be based upon judicial admissions, appellees contend it can be supported by the jury's finding of a permanent nuisance because MAPCO does not challenge the finding. The jury, however, only assessed damages stemming from the "occurrence in question." We find the only reasonable interpretation of this phrase has reference to the explosion. While a permanent nuisance might fairly be described as a "condition," it is rarely considered an "occurrence."

Accordingly, there is no evidence to support the conclusion that MAPCO was negligent or that it possessed such control over the operation of the Brenham facility to render it liable for damages under the *res ipsa loquitur* doctrine. Appellants' eleventh point of error is sustained.

## IV. GROSS NEGLIGENCE AND MALICE

The jury also found all three appellants acted with gross negligence and malice. These findings provide the basis for the award of exemplary damages. In their first six points of error, appellants attack these findings, and hence the exemplary damages, by arguing the trial court erred in overruling their motions for (1) directed verdict, (2) judgment n.o.v., and (3) new trial because the evidence is legally and factually insufficient to support any finding of gross negligence or malice as to each of the appellants.

Claiming appellees' own experts admit appellants had no subjective awareness of the risk of explosion, appellants argue appellees' "theory of gross negligence seems to be that an abundance of evidence of simple negligence combined with a tragic result metamorphosizes the appellant's conduct into gross negligence." Relying upon *Transportation Ins. Co. v. Moriel*, appellants contend that evidence of ordinary negligence, though it may lead to massive damage, does not constitute proof of gross negligence. *See* 879 S.W.2d 10, 21–22 (Tex.1994). Appellants also argue that even if some evidence shows they could have taken additional safety precautions or used safer equipment to lessen the

risk of injury, such evidence does not necessarily establish gross negligence. *See Sheffield Div., Armco Steel Corp. v. Jones,* 376 S.W.2d 825 (Tex.1964); *Universal Servs. Co., Inc. v. Ung,* 904 S.W.2d 638, 641 (Tex.1995).

■ Where the cause of action accrues, as it did here, before September 1, 1995, a punitive damage award requires proof that the damage or harm resulted from fraud, *malice*, or *gross negligence.*[9] In such cases, the Civil Practice and Remedies Code defines gross negligence as:

> [M]ore than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the persons affected.

*See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 44 (formerly codifed at TEX. CIV. PRAC. & REM.CODE § 41.001(5)); *see also Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 920 (Tex.1981).

In *Moriel,* the Supreme Court held that gross negligence involves two components: (1) the defendant's act or omission and (2) the defendant's mental state. *See* 879 S.W.2d at 21. Gross negligence differs form ordinary negligence in two respects: (1) the defendant must be "consciously indifferent," and (2) his conduct must "create an extreme degree of risk." *Id.*

■ The test for gross negligence contains both an objective and subjective component. *Id.* at 21–22. Subjectively, the defendant must have actual awareness of the extreme risk created by his conduct. *Id.* at 22. Objectively, the defendant's conduct must involve an "extreme degree of risk," a threshold significantly higher than the objective "reasonable person" test for negligence. *Id.* Extreme risk is a function of both the magnitude and the probability of the anticipated injury to the plaintiff. *Id.* An act or omission that is merely thoughtless, careless, or not inordinately risky cannot be grossly negligent. *Id.*

9. *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 1, 45 (formerly codifed at TEX CIV. PRAC. & REM.CODE § 41.003).

For actions accruing prior to September 1, 1995, the Civil Practice and Remedies Code also defines malice as "an act that is carried out by the defendant with a flagrant disregard for the rights of others and with *actual awareness* on the part of the defendant that the act will, in reasonable probability, result in human death, great bodily harm, or property damage."[10]

## A. Standard of Review

In reviewing the evidence under a no evidence point, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *See Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998); *see also Moriel,* 879 S.W.2d at 24. In evaluating legal sufficiency, we are required to determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Moriel,* 879 S.W.2d at 25.

The Supreme Court has held that when conducting a factual sufficiency review of a punitive damages award, we must detail the relevant evidence, explaining why that evidence either supports or does not support the punitive damages award in light of the factors set out in *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). *See Moriel,* 879 S.W.2d at 31. Therefore, in reviewing the appropriateness of the jury's award we will consider (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties affected by the wrong; and (5) the extent to which such conduct offends a public sense of justice and propriety. *See Kraus,* 616 S.W.2d at 910.

## B. Subjective awareness and conscious indifference

While appellants freely admit that neighboring property owners were damaged when the cavern facility exploded, they strenuously contend there was little, if any, evidence to support a finding of gross negligence or mal-

ice. Because they had numerous safety mechanisms and procedures in place at the time of the explosion, appellants claim the jury had no basis for finding they were subjectively aware of the risk, yet consciously indifferent to the rights, safety, or welfare of others.

Appellants point to evidence that the cavern had a capacity of 336,600 barrels and the anticipated inventory on the day of the accident was only 288,305 barrels, or 48,000 barrels less than cavern capacity. Moreover, the cavern had been filled with 297,649 barrels of natural gas liquids without incident on March 11, 1992. Accordingly, on April 7, 1992, appellants believed the cavern contained 9,344 fewer barrels than it did on March 11, 1992. Further, they tested the Barksdale switch a week before the explosion and found it to be fully operational. The technician who ran the test found the trip check system, solenoid, tubing, plunger, valve, and valve handle all functioning normally. He also recalibrated the Barksdale switch at that time and set it to activate if the pressure in the brine string fell below 100 psi.

Finally, appellants contend their confidence in the safety system was reasonable because the same trip check system had worked in 1988 and had closed in the cavern when natural gas liquids began escaping through the brine string. Appellants argue that this evidence shows them to be subjectively justified in believing their safety mechanisms and procedures would shut down the cavern in the event of an overflow.

### 1. Awareness of the risk

We begin our analysis by noting that the transportation and storage of natural gas is an inherently hazardous venture because the potential for disaster is enormous. The Supreme Court has observed:

> In the operation of its business a gas company is bound to exercise such care and diligence as to avoid injury to the ... property of others by the escape of gas.... The degree of care required to

10. *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 1, 44 (former-

ly codified at TEX. CIV. PRAC & REM.CODE § 41.001(6)(B)) (emphasis added).

prevent injury has been variously stated to be ordinary care, due care, due and reasonable care, great care, a high degree of care, and the highest degree of care. This variety of expression means no more, however, than that care and diligence should always vary according to the exigencies which require vigilance and attention, conforming in amount and degree to the particular circumstances under which they are to be exerted.... Therefore, in view of the highly dangerous character of gas and its tendency to escape, a gas company must use a degree of care to prevent damage commensurate to the danger which it is its duty to avoid.

*Prudential Fire Ins. Co. v. United Gas Corp.*, 145 Tex. 257, 199 S.W.2d 767, 772–3 (1946).

Appellants were well aware of the potential danger for property damage, personal injury, and death that could result if the cavern was overfilled. Wes Baker, operations supervisor for Seminole Pipeline from 1981 to 1985, testified that Seminole's instructor's manual on meter tickets and daily operating reports for Mid–America contained the following admonition:

Accurate product inventory records may help prevent accidents resulting in overfilling a cavern, tank or section of pipeline. *Overfilling and/or overpressure of a vessel can result in personal injury, property damage or worse.*

(Emphasis added).

Charles Vest, an employee of Mid–America, testified that the Y-grade product which was stored in the cavern at the time of the explosion had a typical vapor pressure of 250 pounds.[11] A Mid–America publication states:

If the pressure on Y-grade is reduced to or below it's [sic] vapor pressure, the product will suddenly and very rapidly vaporize. This is called flashing. Flashing product can be very dangerous.

Appellants were also aware that natural gas liquids will enter the brine string if the cavern is overfilled, and if natural gas liquids entered the brine string, cavern pressure would be reduced and flashing would occur. Thus, the first line of defense against flashing is to make certain the cavern's inventory of natural gas liquids does not exceed its capacity.

### a. Inaccuracy of inventory estimates

While appellants used meters to track the number of barrels of product moving in and out of the cavern, Wes Baker, an operations supervisor, testified that variables such as temperature and pressure would induce errors in any meter. Because meters cannot precisely measure the amount of product passing in or out of the cavern, it was impossible for appellants to know the exact number of barrels of natural gas liquids stored in the cavern. Although errors induced by inaccurate meters may be relatively small, this inaccuracy is compounded each time product is added to or subtracted from inventory. Only when all natural gas liquids are removed and the cavern is filled with brine alone, can the product inventory be precisely known, *i.e.*, zero barrels. The record shows that appellants were subjectively and objectively aware that as they added and removed product without emptying the cavern, their inventory estimates became less reliable. The longer appellants waited between emptying the cavern, the greater the chance of a major error in inventory calculations.

During normal operations, gas was continuously diverted in and out of a series of caverns along appellants' pipeline network. In the normal course of business, appellants emptied their caverns approximately once a year to insure the accuracy of their inventory estimates. However, because the Brenham facility sat atop a large cavern, Wes Baker testified that appellants attempted to empty it more frequently than some of the other reservoirs. In fact, appellants' records indicate they emptied the Brenham facility and "re-zeroed" the inventory base line on an average of 16 times per year from 1982 through 1991. Curiously, appellants abandoned this practice in 1991. During the first

---

**11.** Y-grade product is a raw mix of natural gas liquids combining ethylene, propane, butane, and natural gasoline.

seven months of 1991, the cavern was emptied eight times. However, between July 12, 1991, and April 7, 1992, the date of the explosion, the cavern was never emptied. In fact, this nine-month hiatus appears to be the longest such interval in the history of the facility.

Because serious inventory discrepancies were often discovered each time the cavern was emptied, prudence required this procedure to be repeated frequently. For example, when appellants did not empty the cavern for four months between February 23, 1987, and June 27, 1987, they discovered an inventory discrepancy of 28,710 barrels. When appellants did not empty the cavern during a five-month period in 1989, they discovered they had underestimated cavern inventory by 24,347 barrels. In fact, significant errors occurred even during brief intervals. Records show the cavern was emptied on September 18, 1987; the inventory was reset to zero, and the cavern was refilled. Three days later, on September 21, 1987, the cavern was emptied again and found to contain 15,129 more barrels of natural gas liquids than anticipated. The cavern was refilled and emptied the following day. After only one day's use, appellants discovered they had underestimated inventory by an additional 6,818 barrels. The inventory base line was reset to zero, and the cavern was put back in use. When it was emptied two days later on September 24, 1987, appellants found an unexpected 9,953 barrels in the cavern. In other words, if the cavern had not been emptied three times during the six-day period between September 18, 1987, and September 24, 1987, the cavern would have contained 31,-900 more barrels of natural gas liquids than anticipated.

Six months before the accident, in October of 1991, a data clerk in Tulsa discovered a mistake of 28,406 barrels had been made in Brenham. When Charles Vest discovered he had made a significant miscalculation regarding the amount of product transferred from the Brenham cavern into a customer's line, he wrote a memorandum to his supervisor in which he admitted:

I misunderstood the accounting procedure to be used in accounting for barrels delivered to UTTCO from ten days earlier this month. Due to this we subtracted barrels delivered to UTTCO from cavern inventory in error. The net result is that we need to add 28,406 barrels to the cavern inventory at Brenham.

On March 11, 1992, less than a month before the accident, inventory estimates indicated the volume of the cavern had reached 297,649 barrels, an all-time high. Because the cavern had not been emptied in 8 months, this estimate was highly suspect and an employee was assigned to "sit" the cavern, i.e., remain at the site all night to watch for any signs of an overfill. The cavern did not overflow that evening. The cavern's inventory was subsequently reduced and appellants deemed it unnecessary to continue to "sit" the cavern during the evening hours.

At the end of March, eight days before the explosion, Seminole held a meeting to discuss cavern inventory. Because there had been a series of serious inventory miscalculations, Charles Vest suggested the cavern be emptied and the inventory "reset to zero." Vest's suggestion, however, was disregarded, the cavern was not emptied, the inventory calibrations were not reset, and more natural gas liquids were pumped beneath the ground.

David Allen Haney, scheduler for MAPCO/Mid–America, also discussed the possibility of zeroing-out the cavern. He testified he told John Mobley, Vest's field supervisor, that schedulers are totally dependent on the data provided by the field staff, and that just two days before the accident, he and Mobley "discussed that [the cavern] was up there at the operating limit.... We definitely talked about lowering the inventory." Despite his concerns, the cavern was not emptied and Haney personally ordered approximately 36,-000 additional barrels placed in the cavern.

After the accident, Wes Baker headed up a team to reconstruct the cavern's inventory. The starting point for the reconstruction was the last time the inventory had been reset to zero, nine months earlier. The team estimated that, at the time of the accident, there were approximately 50,000 *more* barrels of product in the cavern than shown on appel-

lant's records. One thousand barrels of the overage was attributable to 85 different arithmetic errors made by the cavern's operators. Almost 700 other errors resulted from operators using incorrect temperature and pressure correction factors in their calculations. Baker's team finally determined that the size of the overage was an aggregate of mismeasurements made by the cavern operators over a 270–day time period.

### b. Inadequacy of the safety trip check system

The trip check system was appellants' second line of defense against a catastrophic failure. It was designed to shut in the cavern if gas began flowing up the brine string, and it did so successfully on one occasion several years prior to the explosion. This system, however, had a mixed history of success. On March 18, 1982, Charles Vest was in the station control building at the Brenham facility when a 20 to 30 foot plume of water and gas began spewing out of brine pit number one. Because the Barksdale switch did not shut in the cavern, Vest had to manually close the trip check valve. Vest reported the system failure to the operations supervisor, Wes Baker. Likewise, in 1988, Vest observed gas escaping to the surface of brine pit number one when the Barksdale switch failed to shut in the cavern during an inadvertent overfill. Vest was again forced to manually shut down the cavern. Fortunately, these incidents occurred during normal work hours; otherwise, the leaks would have continued unabated.

Troy Boisen was primarily in charge of testing and calibrating the Barksdale switch every six months. If the switch did not operate properly three times in succession, he replaced it. Boisen testified that appellants had no written company procedures concerning the periodic Department of Transportation (DOT) inspections of the Barksdale switch. When performing inspections and maintenance on the switch, Boisen merely set the switch to the pressure range marked on the DOT report, 100 p.s.i. Admitting that he did not know the switch's recommended activation range, Boisen was not aware the manufacturer's specifications cautioned that if the switch's settings were set beneath the recommended range, the switch would not operate reliably.

Rudolf Wolf, president and general manager of Barksdale, Incorporated, the manufacturer of the Barksdale switch, testified that his company conducted a post-accident examination of the switch used at the Brenham saltdome facility. Barksdale's technicians discovered the switch used by appellants was an odd assemblage of "cannibalized" parts taken from other Barksdale switches. The switch housing had been manufactured prior to November, 1984. The bourdon tube had been put in stock in January, 1989. The microswitch was manufactured in 1980, and the block bracket was made in 1985. Sometime after the switch was shipped from the company, its two set screws had been either removed or loosened and retightened. One screw was set at 90 pounds and the other at 100 pounds. An adjustable bourdon tube's switches typically range from 150 to 200 psi up to 18,000 psi. The adjustable range for the switch involved in this accident was designed to operate between 160 to 2,000 psi. When set at 100 psi, as it was here, Barksdale's literature indicates the switch would yield poor accuracy.

Barksdale technicians attempted to "trip" the switch by applying pressure ranging from 10 to 200 psi. The switch did not activate. Further examination of the switch revealed corrosion inside the pressure connection, switch housing, and the threads of the switch housing. The surge dampener was totally obstructed with particles of brown material that could have been a combination of sand, rust, pipe scale, and salt crystals. When technicians removed the surge dampener, the switch worked properly. Appellees' expert witness testified that he had examined the switch and concluded that it had not been properly maintained. He based his conclusions on (1) corrosion inside the switch's pressure connection; (2) corrosion in the switch housing; (3) corrosion in the threads of the switch housing; (4) dirt and debris clogging the sensing line; and (5) brown material totally blocking the surge dampener.

### 2. Conscious disregard of the danger

Despite appellants' knowledge that the Barksdale switch was the *only* automated, non-manual, safety device on the brine string capable of shutting in the cavern, appellants only tested its reliability semi-annually. Appellants also knew the switch had been rebuilt from used parts and had made the conscious decision to set it below its recommended operating range. The employee in charge of maintaining, testing, and calibrating the switch was, by his own admission, ignorant of the manufacturer's recommended pressure range for this switch.

Despite the sporadic reliability of their automated safety mechanisms, appellants left the Brenham cavern unattended 16 hours of each day.[12] During the evening hours, the last line of defense was a monitoring station in Tulsa, Oklahoma, where four dispatchers watch over Mid–America's approximately 10,000 miles of pipeline twenty-four hours a day. On the day of the accident, three dispatchers were monitoring the pipeline. That morning, Gary Dwayne Nabors, dispatcher for Mid–America, was supervising Dwight A. Aryain, a dispatcher trainee.

Nabors, had undergone four months of training before he assumed the position of dispatcher. At no time during his training had he ever been placed in a mock situation involving a cavern overfill, nor did appellants possess any equipment to simulate an emergency scenario.

When the Tulsa monitoring center received the hazardous gas alarm, Nabors and Aryain followed the company's standard operating procedure. Aryain telephoned Troy Boisen and asked him to drive out to the Brenham cavern and "check it out." Because only one sensor detected gas and the two men did not see anything on their system console that would indicate gas had entered the brine string, they chose not to notify emergency personnel. Aryain assumed that if the cavern had overfilled, the safety check system would shut down the cavern automatically.[13] Although the hazardous gas alarm sounded 27 times, Aryain did not wait for Boisen to call back, but left the building when his shift ended.

Aryain was relieved by Roger Collins, a dispatcher with fifteen years experience. Aryain and Norris briefed Collins on the gas alarm and told him that they had called Boisen, but did not inform him as to the time of the call. Collins confirmed that it was company policy not to treat one hazard sensor as an emergency situation. He had confidence in the minicomputer system, and testified that "[i]f everything worked like it should have there would have been enough information" to realize there was a dangerous situation in Brenham. Unfortunately, Collins' monitors never registered a trip check, fire, rate of flow change, or any other faults. As Collins later related, "[there] simply wasn't enough information there to tell me that we had a problem." If the system had reported more faults, Collins said he would have alerted emergency personnel to the danger.

However, even if Tulsa had realized there was an emergency situation in Brenham, the monitoring facility had no means by which it could remotely activate the trip check system or close in the cavern. The only way to stop product from flowing out of the cavern was for someone to physically enter the Brenham facility and manually close the valve.

Alan Wolf, an employee of Mid–America, was, at the time of the accident, a computer technician maintaining the minicomputer system. He testified that the software for the system was developed in 1974 by TRW, and was installed in 1982 on two mirrored minicomputers. While this was considered "state of the art" in 1982, Wolf acknowledged that by 1990, it was obvious "we were pushing the limits of the system, as far as how many points it could handle, how fast it could process data." The system had several other weaknesses, including a lack of software packages to detect leaks, and an unfortunate

12. Since the explosion, all storage caverns in Texas are manned twenty-four hours a day.

13. Prior to the explosion, no one taught Aryain what an overfill situation would look like on a monitor, nor was he ever exposed to simulated drills of what the computer readouts would look like if the cavern overfilled.

tendency to crash frequently. Wolf testified the system "was being rebooted every three to five days." During a reboot, dispatchers did not have control of the system. Data from the minicomputer system was displayed in a tabular format instead of real-time graphic readouts, and the system did not have the ability to display real-time graphs of pressures, discharge pressures, and cavern pressure. Wolf also conceded the computer system in place at the time of the explosion did not have the capability to discern whether the cavern was being overfilled. Wolf admitted the system was limited in the length of the alarm message it could display, and at the time of the explosion, it was not possible to record data as it came in and replay past events. In February, 1992, less than a month before the accident, Wolf wrote a memo outlining new features he would like to see on the new system, including a simulator training station.

Timothy Richard Moran, an employee of PB–KBB, Inc., an engineering construction company, was hired by MidAmerica, Seminole, and MAPCO, to investigate the accident. Moran concluded that having only one safety device on the brine string was not "a reasonable design" and further determined that having only one device on the brine string would not be what he considered "an adequate design." He also stated that the explosion would not have occurred if the Brenham facility had installed and maintained a flare. Such a flare would have ignited the escaping gas long before it could accumulate into an explosive cloud. In a safety publication authored by Moran, he recommended (1) an excess flow detector on the product line; (2) redundant safety systems employing two devices (ESD valves) on the brine line; and (3) two devices on the product line set to detect different parameters, including pressure flow and/or conductance and pressure. When an abnormal situation occurred, one of the detectors would detect the anomaly and shut down the system. PB–KBB also recommended a separator/flare system.

### C. Gross negligence

██ The testimony of appellants' own employees establishes their subjective and objective awareness that their meters were imprecise and that their inventory estimates could differ from actual inventory by thousands or tens of thousands of barrels. Evidence established that appellants were also aware that (1) their inventory estimates were often in error; (2) they had grossly underestimated the cavern's inventory in 1982; (3) a major calculation error had taken place six months earlier; (4) they had a "cloud" on the inventory; (5) the cavern's inventory was reaching capacity; (6) the only way to get an accurate measurement of the cavern's inventory was to zero out the cavern; and (7) it had been nine months since the cavern had been emptied.

As early as 1990, appellants knew they were pushing the limits of their old computer monitoring system. They were aware (1) it had no packages in place that would detect leaks; (2) the system went down every three to five days; (3) when the system was rebooted dispatchers did not have control of the system; (4) data was displayed in a tabular format instead of real-time graphic readouts of pressures, discharge pressures, and cavern pressure; and (5) even if an emergency situation in Brenham were discovered, the dispatch facility had no capability to close the "trip check" remotely.

We find the evidence is legally sufficient and conclude the jury was justified in finding Seminole and Mid–America had an actual subjective awareness of the risk of an overfill. They were also aware that an overfill would present a danger of a massive explosion. Nevertheless, they consciously proceeded to add natural gas liquids to the cavern without manning the facility, installing a flare system, setting up duplicate or redundant trip check safety mechanisms, or otherwise attempting to lessen the danger. In short, Seminole and Mid–America proceeded with conscious indifference to the rights, safety, and welfare of others.

We also reject appellants' contention that the evidence was factually insufficient to support the jury's finding of gross negligence. We are aware that appellants did not deliberately overfill the cavern and once the leak was discovered, their employees risked their

lives and suffered personal injury attempting to stem the flow of gas. Further, appellants attempted to maintain a safety margin of 36,000 barrels by never filling the cavern with more than 300,000 barrels of natural gas liquids. Finally, appellants were aware the Barksdale switch had successfully shut in the cavern on one occasion when it was inadvertently overfilled.

However, Seminole and Mid–America were also aware the Barksdale switch had failed on at least two occasions. The Brenham facility was designed by the president of Seminole and appellants knew (1) the Barksdale switch was the only safety device at the facility that had the capability of shutting in the cavern in the event of an overfill; (2) they had only the vaguest notion of the size of their product inventory because nine months had elapsed since the cavern had been emptied; (3) if the cavern overfilled during the night, no employees would be at the facility to visibly observe the escaping gas; (4) the computer system designed to alert company dispatchers in Tulsa was approaching obsolescence and was incapable of providing much of the information needed to discern whether the cavern had overfilled; (5) even if alerted to the danger, Mid–American dispatchers in Tulsa had no means of remotely shutting in the cavern; (6) by the time a local employee could be alerted and directed to manually shut in the cavern, he would likely need emergency breathing apparatus stored 90 miles from the facility. The jury's finding of gross negligence is amply supported by the evidence, and we cannot say its finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

### D. Malice

"Gross negligence" and "malice" are not synonymous. Historically, "gross negligence" has always been perceived as a lower and less deliberate level of culpability than "malice," and facts establishing the former will not necessarily support the later.

The concepts of gross negligence and malice first appear in criminal law sometime after the thirteenth century as a means of distinguishing levels of homicide based upon a defendant's *mens rea*. *See* 2 SIR FREDERICK POLLOCK AND FREDERIC WILLIAM MAITLAND, THE HISTORY OF ENGLISH LAW 464–86 (2d ed. Cambridge 1899). The distinction between a willful murder and a homicide by misadventure was expressed in terms of *malitia praemeditata* and *malitia excogitata*. An intentional homicide, *i.e.*, one committed with "malice aforethought" was punishable by death, while an accidental homicide due to negligence carried no criminal liability. Later, an intermediate level of culpability, *i.e.*, "gross" or "criminal" negligence, was recognized in cases of involuntary manslaughter. *See United States v. Browner*, 889 F.2d 549, 553 (5th Cir.1989) (stating that under common law the "requisite mental state [for manslaughter] is reduced to 'gross' or 'criminal' negligence, a culpability that is far more serious than ordinary tort negligence but still falls short of that most extreme recklessness and wantonness required for 'depraved heart' malice").

"Malice" constituted the highest level of criminal culpability and was defined as the "willful and intentional doing of some wrongful act." *See Crutchfield v. State*, 110 Tex. Crim. 420, 10 S.W.2d 119, 121 (1928). This is not to say, however, that the defendant had to intend a specific result of his actions or even hate his victim. In *Banks v. State*, where the defendant fired indiscriminately at a moving train and killed a man he did not know, the Court of Criminal Appeals wrote:

> Malice may be toward a group of persons as well as toward an individual. It may exist without former grudges or antecedent menaces. The intentional doing of any wrongful act in such manner and under such circumstances as that the death of a human being may result therefrom is malice.

85 Tex.Crim. 165, 211 S.W. 217 (1919).

"Gross negligence," while less culpable than "malice," was also based upon conscious decisions and deliberate conduct. "The difference between malice, which will support conviction for murder, and gross negligence, which will permit of conviction only for manslaughter, is one of degree rather than kind." *United States v. Fleming*, 739 F.2d 945, 948 (4th Cir.1984). Malice "contemplates a sub-

jective awareness of a higher degree of risk than does gross negligence, and involves an element of wantonness which is absent in gross negligence." *People v. Watson*, 30 Cal.3d 290, 179 Cal.Rptr. 43, 637 P.2d 279 (Cal.1981).

The concepts of "gross negligence" and "malice" migrated into civil law as civil liability began to attach to criminal homicides. While early Teutonic law supplied a measure of compensation to the families of murder victims, the common law provided no recompense.[14] Under the common law, a cause of action for personal injuries resulting in death terminated upon either the death of the victim, or the wrongdoer. *See Burk Royalty*, 616 S.W.2d at 916. This rule came under attack around the middle of the nineteenth century, and in 1869 the Texas Constitution added a provision for the recovery of exemplary damages in cases of homicide resulting from a "willful act or omission." *Id.* In 1876,

the Constitution expanded this right to include homicides due to gross negligence.[15]

In 1974, "malice" disappeared from Texas criminal law with the adoption of a new penal code.[16] It survives, however, in civil law where it remains distinctly different from gross negligence. *See Randolph v. Edmonds*, 185 Tenn. 37, 43–45, 202 S.W.2d 664, 667 (1947). The primary distinction between "malice" and "gross negligence" is, in both civil and criminal law, the certainty of causing harm. When a defendant acts with gross negligence, his conscious indifference to the risk subjects the plaintiff to a *"likelihood"* of serious injury. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex.1998). However, when a defendant acts with malice, he is aware that his flagrant disregard of the plaintiff's rights will, *"in reasonable probability,"* result in death, great bodily harm, or property damage. *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 1, 44 (formerly codified at TEX. CIV. PRAC. & REM.CODE § 41.001).[17]

**14.** Teutonic law prescribed a price on human life. *See* 2 POLLOCK AND MAITLAND at 449–51. In the case of an egregious homicide, the offender forfeited his life at the hands of the victim's kinsmen. This had the unintended effect of spawning blood-feuds, and thus with less egregious homicides, the offender was not executed, but was required to pay a monetary sum for the life he had taken. One payment, the *bót*, was paid to the victim's family. Another payment, the *wte*, was made to the king. *Id.*

In England, however, it was established during the Norman age that while willful homicide was a capital crime, the family of the victim had no right to compensation of any kind. *Id.* at 459.

**15.** TEX. CONST. art. XVI, § 26:

Every person, corporation, or company, that may commit a homicide, through wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide.

**16.** Criminal "malice" has been replaced with culpable mental states of "intentionally" and "knowingly." *See* Act of May 24, 1973, 63rd Leg., R.S., ch. 399, 1973 Tex. Gen. Laws 883, 892 (codified at TEX. PENAL CODE §§ 6.02–.03). These two terms, however, continue to closely track the civil definition of malice. Compare the two definitions of malice found in § 41.001 with the definitions of intentional and knowingly found in the Penal Code:

(6) "Malice" means:

(A) conduct that is specifically intended by the defendant to cause substantial injury to the claimant; or

(B) an act that is carried out by the defendant with a flagrant disregard for the rights of others and with actual awareness on the part of the defendant that the act will, in reasonable probability, result in human death, great bodily harm, or property damage.

*See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 1, 44 (formerly codified at TEX. CIV. PRAC. & REM.CODE § 41.001).

(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

*See* TEX PENAL CODE § 6.03 (Vernon 1994).

**17.** We believe "reasonable probability" represents a higher standard than "likelihood" and is akin to the "high probability" standard of criminal malice. *See Watson*, 30 Cal.3d at 300, 179 Cal.Rptr. 43, 637 P.2d 279. If "reasonable probability" had the same meaning as "likelihood," there would be no meaningful distinction be-

Here, appellees presented considerable evidence that appellants were cognizant of the hazardous danger which would occur if the cavern was overfilled. As we have previously stated, the evidence further shows appellants knew their inventory estimates were suspect. Appellants, nevertheless, consciously disregarded the risk, thereby creating the "likelihood" of a catastrophic explosion and serious injury. However, we find no evidence in the record before us that appellants believed the cavern would probably overflow. In fact, the undisputed evidence shows appellants believed the cavern inventory was at least 9,000 barrels below what it had been less than a month before the accident. While inventory inaccuracies certainly raised a likelihood the cavern might overflow, there is no evidence to show appellants believed it would probably overflow.

Accordingly, we hold the evidence is legally and factually sufficient to support the jury's findings of gross negligence, but legally and factually insufficient to sustain the finding of malice. We therefore sustain appellants' fourth point of error and overrule their first, second, third, fifth, and sixth points of error.

## V. PUNITIVE DAMAGES CAP

In points of error seven through ten, appellants contend the trial judge misinterpreted the punitive damages cap found in Section 41.007 of the Civil Practice and Remedies Code.

The aggregate compensatory damages found by the jury for all of the plaintiffs, including past and future mental anguish, was $5,395,400. The jury awarded punitive damages in the amount of $46,000,000 against *each* defendant. The jury then apportioned the punitive damages award among the various plaintiffs by assigning each a specific percentage of the award. The portion assigned to each of the O'Donnells, for exam-

ple, was 14.99%. The portion assigned to W.H. Tonn and Jeanne Tonn was 5.79% and 4.74% respectively. Thus, the jury's verdict for the appellees was:

### Jury's verdict

| Plaintiff | Actual Damages | Punitive Damages / each defendant |
|---|---|---|
| W. W. O'Donnell | $842,000 | $6,895,400 |
| Regina O'Donnell | $842,000 | $6,895,400 |
| W. H. Tonn, III | $353,250 | $2,663,400 |
| Jeanne Tonn [18] | $294,250 | $2,180,400 |

The statutory cap on punitive damages in effect at the time this cause of action accrued provides that "exemplary damages awarded against a defendant may not exceed four times the amount of actual damages or $200,000, whichever is greater." [19] Attempting to implement the cap, the trial judge reduced the punitive damages to $21,581,600 per defendant (or four times the total actual damages of $5,395,400). The court then apportioned this sum according to the percentages devised by the jury as follows:

### Court's judgment

| Plaintiff | Actual Damages | Punitive Damages / each defendant |
|---|---|---|
| W. W. O'Donnell | $842,000 | $3,235,081.84 |
| Regina O'Donnell | $842,000 | $3,235,081.84 |
| W. H. Tonn, III | $353,250 | $1,249,574.64 |
| Jeanne Tonn [20] | $294,250 | $1,022,967.84 |

Appellants complain that when the trial court used the total actual damages figure assessed against *all* of the defendants to calculate the amount of punitive damages owed by *each* defendant, it effectively tripled the capped award. Instead, appellants contend the trial court should have used the following equation to calculate the statutory cap:

(actual damages) × 4 = total punitive damages allowed

However, the trial court relied upon the following formula:

---

tween "malice" and "gross negligence." Presuming the Legislature did not intend to enact a useless redundancy, we are bolstered in our belief that the terms have distinctly different meanings. *See Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 485 (Tex.1998) (holding "we do not lightly presume that the Legislature may have done a useless act.").

18. As executrix of the Estate of W.H. Tonn, II.

19. *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 1, 46 (formerly codified at TEX. CIV. PRAC. & REM CODE § 41.007).

20. As executrix of the Estate of W.H. Tonn, II.

(actual damages) × 4 × (number of defendants) = total punitive damages allowed

Appellants claim the trial court has improperly capped the punitive damages at twelve times actual damages instead of four times actual damages.

### A. Application of the cap

We must decide whether the damage cap applies to the *plaintiffs' award* or the *defendants' liability*. If we find the cap should be applied so as to *limit each plaintiff's award* of punitive damages to four times his actual damages, the trial court's judgment violates the statute. However, if we find the cap is applied to *limit each defendant's liability* to four times the plaintiff's actual damages, then we must affirm trial court's judgment as proper.

When construing a statute, we are to consider the "object sought to be attained." *See* Tex. Gov't Code Ann. § 311.023 (Vernon 1988). It seems apparent that one of the purposes of the 1987 tort reform legislation was to make the Texas civil justice system more predictable. *See* John T. Montford and Will G. Barber, *1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System*, 25 Hous. L.Rev. 59, 69 (1988). Presumably, the cap found in Section 41.007 was to provide a measure of predictability by narrowing the range of punitive damages that might be awarded to a plaintiff. However, Senator John T. Montford, the principal author of the statute, has said Section 41.007 was intended to apply on a "per defendant" basis:

Under section 41.007, a claimant cannot recover exemplary damages from any one defendant in excess of four times the amount of the claimant's actual damages, but can recover up to that amount *from each defendant* against whom the trier of fact awards exemplary damages.

Montford, 25 Hous. L.Rev. at 335 (emphasis added).[21]

Ironically, if we find the statute applies on a "per defendant" basis, it will have little value as a "cap." In cases involving multiple tort-feasors, it is not difficult to imagine hypothetical scenarios where the cap would be completely ineffective. Absurdly excessive and even unconstitutional awards of punitive damages are possible under the statute if it is interpreted as "capping" the punitive damages on a "per defendant" basis.[22]

We are cognizant that the opinion of an individual legislator, even a statute's principal author, is not legislative history controlling the construction to be given a statute. *See General Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 923 (Tex.1993). Nevertheless, we find Senator Montford's interpretation persuasive primarily because it is consistent with the plain wording of the statute. The cap provides that "exemplary damages awarded against *a defendant* may not exceed four times the amount of actual damages."[23] Like the civil liability cap found in the Medical Liability and Insurance Improvement Act, "the damages cap amounts should be calculated on a 'per defendant' basis because the [the statute] clearly applies to the recovery against the individual

---

**21.** To provide further illumination, Senator Montford includes the following hypothetical: The plaintiff's actual damages are $100,000. Plaintiff is 20% responsible for the loss; defendant A is 30% responsible; and defendant B is 50% responsible. The jury imposes punitive damages against defendant A in the amount of $250,000 and against defendant B in the amount of $1,000,000. According to Senator Montford, the plaintiff is entitled to collect punitive damages of $650,000, namely, $250,000 from defendant A and $400,000 (4 × $100,000) from defendant B. *Id.*, at 335–37.

**22.** In an amicus curiae brief, the Texas Civil Justice League offered the following hypothetical scenario:

[T]he exemplary damages of a defendant that the jury finds is liable for only one percent of the actual damages would be capped at four times 100% of the actual damages of all the defendants. Thus, for example, if a jury found actual damages of $1 million and fixed one defendant's percentage of responsibility at one percent, that defendant would be liable for only $10,000 in actual damages (one percent of $1 million). But that defendant would be exposed to $4 million in exemplary damages (four times $1 million)—an amount four hundred times its actual damages liability.

**23.** *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 1, 46 (formerly codified at Tex. Civ. Prac. & Rem.Code § 41.007) (emphasis added).

defendant, not the award to the individual plaintiff." *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 847 (Tex.1990).

In construing a statute, we must look to the intent of the legislature and must construe the statute so as to give effect to that intent. *See One 1980 Pontiac v. State*, 707 S.W.2d 881, 882 (Tex.1986). By giving effect to the legislative intent, *i.e.*, that the cap should apply on a "per defendant" basis, we realize our decision renders the statute wholly ineffective in achieving the legislative objective of establishing greater predictability. Still, the task of drafting effective legislation rests with the legislature, not this court.

### B. Calculation of the cap

■ Appellants also contend the trial court improperly calculated the cap when it considered actual damages of "claimants" who were not included in the jury charge. The jury, for example, found the actual damages of W.W. and Regina O'Donnell to be $1,024,000, jointly. The jury further found W.W. O'Donnell was separately entitled to $330,000 for his past and future mental anguish, and that Regina O'Donnell was entitled to a similar amount for her separate past and future mental anguish. Appellants contend there are three separate "claimants" here: (1) W.W. and Regina O'Donnell, jointly; (2) W.W. O'Donnell, individually; and (3) Regina O'Donnell, individually. When the jury was asked to apportion the exemplary damages by assigning a percentage to each plaintiff, the names of W.W. O'Donnell and Regina O'Donnell were separately submitted. Appellants contend that, because the O'Donnells were not also submitted jointly, the trial court should only have considered their individual awards for mental anguish when calculating the cap, and that it erred in including the joint award of $1,024,000 in actual damages.

The statute provides that before punitive damages may be awarded to a "claimant," such person must prove his injury, damage, death, or harm was due to the fraud, malice, or gross negligence of the defendant.[24] According to the Texas Civil Practice and Remedies Code, each plaintiff is a "claimant."[25] Both of the O'Donnells are plaintiffs and, therefore, individual claimants. After finding their damages were caused by appellants' gross negligence, the jury awarded the O'Donnells' property damages jointly because they owned the property jointly. We find the trial court did not err in including their property damages as part of the actual damages when it calculated the punitive damage cap. Like the O'Donnells, the Tonns were also joint owners of property damaged by the explosion, and we find, therefore, the trial court did not err in calculating the punitive damage cap on their actual property damages.

■ Claiming the trial court erred in not suggesting a remittitur, appellants next contend that even after the punitive damages award was reduced by the statutory cap it was excessive. No set rule exists by which we determine whether the amount of exemplary damages was excessive. *See Kraus*, 616 S.W.2d at 910. Factors that are often considered are (1) the nature of the wrong, (2) the character of the defendant's conduct, (3) the degree of the defendant's culpability, (4) the situation and sensibility of the parties, and (5) the extent to which the conduct offends the public sense of justice and propriety. *See Underwriters Life Ins. Co. v. Cobb*, 746 S.W.2d 810, 818 (Tex.App.-Corpus Christi 1988, no writ). We may also consider (1) the frequency of the wrongful conduct; (2) the size of an award needed to deter similar wrongs in the future; and (3) the financial ability of the defendant. *See Haryanto v. Saeed*, 860 S.W.2d 913, 923 (Tex.

24. *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 1, 45 (formerly codified at TEX. CIV. PRAC & REM.CODE § 41.003).

25. *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 1, 44 (formerly codified at TEX CIV PRAC & REM CODE § 41.001): "Claimant" means a party, including a plaintiff, counterclaimant, cross-claimant, or third-party plaintiff, seeking recovery of exemplary damages. In a cause of action in which a party seeks recovery of exemplary damages related to injury to another person, damage to the property of another person, death of another person, or other harm to another person, "claimant" includes both that other person and the party seeking recovery of exemplary damages.

App.—Houston [14th Dist.] 1993, writ denied). The ratio between the amount of actual damages and exemplary damages will vary according to the facts of the particular case. *See Kraus,* 616 S.W.2d at 910. In reviewing the award, the court will determine whether, under the circumstances of the case, the award is reasonably proportional to the actual damages. *See id.* One of the major purposes of awarding punitive damages in Texas is to punish and deter the wrongful conduct of the party. *See Moriel,* 879 S.W.2d at 29. In reviewing a punitive damage award, we can only vacate or suggest a remittitur if we find the punitive award is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id.,* at 30.

■ Here, the wrong committed by Mid–America and Seminole is that while they were aware of the extremely hazardous nature of their product, they continued filling the cavern during the evening hours while the facility was unmanned, knowing they had no reliable estimates of their present inventory, the cavern was near capacity, and that if overfilled, the cavern could empty its entire contents into the atmosphere. The character of appellants' conduct placed the owners of neighboring lands and residences in profound danger of a catastrophic explosion. The culpability of Mid–America and Seminole is further increased by their knowledge of the facility's limitations, the history of inventory miscalculations and overfills, the intermittent reliability of the sole automatic shut-down device on the brine string, and the inability of dispatchers in Tulsa to remotely shut down the cavern. Neighboring land owners were unaware of the risks being taken by appellants and were unable to take any protective measures. Their homes, their possessions, their lands, their livestock, and their physical safety were jeopardized by appellants' conduct. Few commercial activities carry the inherent capability of achieving the magnitude of destruction presented here. We find appellants' cavalier posture toward the storage of more than 300,000 barrels of natural gas liquids and the threat imposed to neighboring land owners is highly offensive to any sense of justice and propriety.

The devastation wrought by the explosion was fueled by a cloud of no more than 5,000 barrels of vaporized gas, a very small percentage of the cavern's inventory. Had the escaping gas not been detonated by a passing automobile, the cloud and the accompanying damage could have reached enormous proportions. After reviewing the evidence, we do not find the award of punitive damages to be excessive under the facts presented here.

Accordingly, we overrule appellants' seventh, eighth, and tenth points of error.

## VI. MENTAL ANGUISH

Appellants contend in points of error twelve, thirteen, twenty-six, and twenty-seven that, because appellees were not physically injured in the blast, the evidence is legally and factually insufficient to support the jury's award of damages for mental anguish. Appellants assert that a claim for mental anguish, based solely on the loss of property, cannot be sustained. Alternatively, in points of error twenty-eight, twenty-nine, forty-two, and forty-three appellants argue that the jury's mental anguish award is excessive. Finally, in points of error forty-four and forty-five appellants assert that the trial court impermissibly lowered appellees' burden by submitting a defective definition of mental anguish.

Emotional distress is a subjective injury that is hard to predict, often speculative, easily fabricated, difficult to verify, and almost impossible to refute. Thus, the early general common law rule was that mental anguish damages were not recoverable. *See Parkway Co. v. Woodruff,* 901 S.W.2d 434, 442 (Tex.1995). Still, justice requires the victim be fully compensated for his injury or loss, and on some occasions the injury is largely, if not primarily, emotional. The Supreme Court has struggled, therefore, to fashion principles permitting recovery for severe emotional distress while maintaining constraints and safeguards against those who are merely disappointed, embarrassed, or angry.

■ The first restrictive principle regarding mental anguish is that liability does not extend to mere insults, indignities,

threats, annoyances, petty oppressions, or other trivialities because it is too easy for a person to claim his feelings have been hurt. RESTATEMENT (SECOND) OF TORTS § 46 cmt.(d) at 73 (1965). Moreover, in Texas, there is no independent cause of action for the negligent infliction of emotional distress. *See Boyles v. Kerr,* 855 S.W.2d 593, 597 (Tex.1993). As a safeguard against fabricated claims, damages for mental anguish are recoverable only when based upon a verifiable breach of some other cognizable legal duty. *See id.* Finally, if the plaintiff's injury is purely economic, his claim of mental anguish is suspect.[26] The Texas Supreme Court recently held that when a plaintiff's emotional distress is based *solely* on negligent damage to his property, he cannot recover for mental anguish. *See City of Tyler v. Likes,* 962 S.W.2d 489, 497 (Tex.1997).

Here, however, appellees' loss was not due to simple negligence, but to acts of gross negligence. Thus, the issue presented here was not addressed in *Likes.*[27] We must now decide the issue left unanswered in *Likes*— whether a claim of mental anguish can rest solely upon property damage caused by a defendant's willful, malicious, or grossly negligent acts.

■■■ Where the defendant's negligent or willful acts have proximately caused injury, harm, or loss, the object of the law is to make the plaintiff whole, that is to restore to him fully all that was wrongfully taken, damaged, or destroyed.[28] A plaintiff whose property has been destroyed by the tortuous acts of another is generally entitled to recover the market value of the property at the time of its loss. The market value of the damaged property, however, may not fully reflect the value of the item to its owner. "[A] personal record or manuscript, an artificial eye or a dog trained to obey only one master, will have substantially no value to others than the owner." RESTATEMENT (SECOND) OF TORTS § 911 cmt.(e) at 474 (1979). Nevertheless, if the property can be replaced, the plaintiff's compensatory damages are limited to the cost of replacement. *See id.* If the item cannot be replaced, the plaintiff is entitled to recover its special value to the owner as evidenced by its original cost, quality, and condition at the time of its loss. *See id.; see also Allstate Ins. Co. v. Chance,* 590 S.W.2d 703, 704 (Tex.1979) (restating the rule that where goods have no recognized market value, the jury may consider the original cost, cost of replacement, opinions of qualified witnesses, and the use to which the property was put).

■■■ As a general rule, compensatory damages do not include sentimental value. *See* RESTATEMENT (SECOND) OF TORTS § 911 cmt.e at 475 (1979). However, when an object's primary value is in sentiment, that is, when the object's special value is greater than the market value, then the sentimental value becomes the sole criterion for the assessment of damages. *See Brown v. Frontier Theatres, Inc.,* 369 S.W.2d 299, 305 (Tex. 1963).

Thus, while "value" is the primary component in assessing property damages, it may not reflect the full measure of the plaintiff's damages. A plaintiff may be very fond of a

---

**26.** *See and compare Stewart Title Guar. Co. v. Aiello,* 941 S.W.2d 68, 72 (Tex.1997) (breach of contract will not support claim of mental anguish); *Federal Land Bank v. Sloane,* 825 S.W.2d 439, 442–43 (Tex.1991) (mental anguish damages are not recoverable for negligent misrepresentation); *Duncan v. Luke Johnson Ford, Inc.,* 603 S.W.2d 777, 779 (Tex.1980) (careless violation of the Deceptive Trade Practices Act will not provide a basis for mental anguish); *Bekins Moving & Storage Co. v. Williams,* 947 S.W.2d 568, 584 (Tex.App.-Texarkana 1997, no writ) (DTPA and insurance cases that do not involve personal injury cannot support claims of mental anguish without "knowing" conduct).

**27.** In fact, the court specifically reserved the question for future disposition when Chief Justice Phillips wrote: "Because the injury to Likes's property was not intentional or malicious, or even grossly negligent, we need not decide whether mental anguish arising out of property damage may be legally compensable when a heightened degree of misconduct is found." *Likes,* 962 S.W.2d at 497.

**28.** "It is the duty of the courts to afford a remedy and redress for every substantial wrong." *Robb v. Pennsylvania R.R. Co.,* 210 A.2d 709, 714 (Del. 1965). "Every act of man whatever that causes damage to another obliges him by whose fault it happened to repair it." *Powell v. Brookshire's Grocery Co., Inc.,* 705 So.2d 286, 292 (La. Ct. App. [2nd Cir.] 1997).

favorite chair, but unless the chair is an heirloom with a sentimental value exceeding its market value, the emotional pain occasioned by its loss cannot be added to the chair's market value. Full restitution would theoretically include compensation for both (1) the market value of the chair and (2) the emotional affliction stemming from its loss. The majority rule, however, is that damages for emotional distress are not included within actual damages merely for the loss of things. *See* RESTATEMENT (SECOND) OF TORTS § 911 cmt.e at 475 (1979). There are several reasons for the rule.

■ Frequently, no nexus of proximate cause exists between the negligent acts of the defendant and the plaintiff's emotional distress. To prevail on a claim of emotional distress, the plaintiff must establish the defendant negligently committed some other tort and that such negligent injury *proximately caused* severe emotional distress. *See Campos v. Ysleta Gen. Hosp., Inc.*, 836 S.W.2d 791, 795 (Tex.App.-El Paso 1992, writ denied). While pain and suffering are natural consequences of a personal injury, the loss of property is normally associated only with annoyance and inconvenience. Thus, severe emotional distress is not usually a foreseeable consequence of property damage. *See Likes*, 962 S.W.2d at 495.

Even when damages are awarded for personal injuries, the determination of a monetary award for mental suffering is highly speculative. When mental anguish is based solely upon property damage, few fact finders are able to relate to the extreme emotional attachment to material possessions needed to spawn true emotional distress. The Supreme Court of Wisconsin has concluded that to permit recovery for emotional distress arising from property damage

> ... would remove any logical stopping point to a tortfeasor's liability. Each and every plaintiff in any property damage claim could assert an emotional distress claim based not on the effect of the incident itself, but on how their lives had changed since the underlying incident. Such an allowance could open the way to

recovery for stress incurred by any amount of damage to any type of property. *Kleinke v. Farmers Coop. Supply & Shipping*, 202 Wis.2d 138, 549 N.W.2d 714, 717 (Wis.1996).

Also, a claim of mental suffering is easily fabricated and difficult to refute. Mental anguish stemming from the loss of property is, to some extent, contingent upon the plaintiff's sentimental attachment to the property.

> To determine when such an attachment to property is real and when it is false, and to determine exactly how significant the attachment is, would be difficult, if not impossible. Every plaintiff in a negligent property damage case would be encouraged to claim an extreme emotional attachment to the damaged property.

*Kleinke*, 202 Wis.2d at 146, 549 N.W.2d at 717. Traditionally, damages for emotional distress have been permitted *only* where there is some means for assuring the validity of the claim. *See State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 435 (Tex.1995).

■ Finally, the resolution of such claims can be overly burdensome to the judicial system. Claims based on mere worry, anxiety, vexation, embarrassment, or anger are not actionable. *See Parkway*, 901 S.W.2d at 444. While persons may become distraught over the loss of property, such distress is a life experience that all may unfortunately expect to endure. *See Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis.2d 627, 517 N.W.2d 432 (Wis.1994). Thus, even when the plaintiff suffers serious emotional distress, his ability to recover is sometimes restricted to preserve judicial resources. *See Blagrove v. JB Mechanical, Inc.*, 934 P.2d 1273, 1276 (Wyo.1997).

While all of these considerations are applicable to claims of mental anguish arising solely from *negligent* injury to property, they may have little or no application to similar claims based upon *intentional* torts. Harm intentionally inflicted is made more painful precisely because it is intentionally inflicted. "[E]ven a dog distinguishes between being stumbled over and being kicked."[29] While the tort-feasor may intend only to inflict

---

29. OLIVER WENDELL HOLMES, JR, THE COMMON LAW 3 (Boston, Little 1881).

physical or economic injury, he nevertheless intends harm to the plaintiff, and the mental anguish associated with such a deliberate act is foreseeable. Proximate cause is, therefore, more easily established, and in the case of many intentional torts, such as assault, battery, false imprisonment, and defamation, mental suffering frequently constitutes the principal element of damages. *See Gonzales v. Personal Storage, Inc.,* 56 Cal.App.4th 464, 65 Cal.Rptr.2d 473, 477 (Cal.Ct.App.1997).

 Further, when a tort-feasor engages in extreme and outrageous intentional invasions of the plaintiff's mental and emotional tranquility, the outrageous conduct affords the necessary assurance of the validity of the claim. *See id.*; *Powell v. Brookshire's Grocery Co., Inc.,* 705 So.2d at 292. Thus, the modern rule provides for recovery of emotional distress damages in cases of intentional torts. *See Birchler v. Castello Land Co., Inc.,* 133 Wash.2d 106, 942 P.2d 968, 973 (Wash.1997).

Having concluded that intentional injury to property will support a claim of mental anguish where simple negligence will not, we must next decide whether gross negligence will support a claim for emotional distress. Whether the "value" of plaintiff's property is lost due to negligence, gross negligence, or an intentional act, the extent of the "property" tort or material loss is the same. The distinguishing factor which permits damages for mental anguish in the case of an intentional tort, but denies it for simple negligence, is the presence of a malevolent intent personally directed at the plaintiff. Only when there is an intentional interference with property interests can it be inferred that the defendant intended to harm the plaintiff. *Birchler,* 942 P.2d at 973. When a tort-feasor damages a plaintiff's property through gross negligence, such a desire may or may not be present.

To illustrate the concept, suppose a very expensive vase which is a family heirloom of great sentimental value is kept by its owner on a table.[30] A friend, who is aware of the owner's feelings, inadvertently bumps against the table and knocks the vase to the floor. The owner sinks into depression and suffers severe emotional distress. Because the property damage was due to simple negligence, the owner cannot recover for her mental anguish.

Suppose, however, the friend picks up the vase, and intending to alarm its owner, begins pitching it into the air. The friend does not intend to damage the vase, but he accidentally fails to catch it and the heirloom is broken. It is not simply the friend's gross negligence and conscious disregard that would subject him to liability for mental anguish, but his intent to emotionally torment the owner. Although the friend did not intend to cause severe emotional distress, his motive was to cause worry, anxiety, and vexation. Thus, the tort was not perpetrated merely against the owner's property, but against the owner personally.

Suppose the friend, having no intention to alarm the owner, decides to move the table without first securing the vase. Although aware of the danger, the friend consciously disregards it and deems it more expedient to transport the table and the vase in one trip rather than to safely move them individually. While moving the table and vase, the friend stumbles, tipping the vase and causing it to roll off the table and smash onto the floor. The loss is due to gross negligence unaccompanied by personal animus against the owner.

The Supreme Court of Alabama considered a case where the plaintiff's automobile was losing engine coolant. When the plaintiff took his car to a repair shop, he was informed the problem was probably due to a defective head gasket. Later, the repair shop mechanics told the plaintiff the engine head was cracked and would have to be replaced. The mechanic showed the plaintiff four marks on the head and said they were visible cracks. After the head had been replaced, the plaintiff took the old head to an auto parts shop to determine why it had cracked. He was informed that the head was not cracked and that the marks were factory

---

**30.** Our illustration is adapted from the hypothetical scenario used by the Superior Court of Delaware. *See Pritchett v. Delmarva Builders, Inc.,* No. 97C–03–011, 1998 WL 283376, at *4 (Del.Super.Ct. Feb.27, 1998).

markings placed on the head at the time of its manufacture. When the plaintiff called the auto repair shop to complain, he was vigorously assailed with insulting and abusive language. *See Reinhardt Motors, Inc. v. Boston,* 516 So.2d 509 (Ala.1986).

In *Reinhardt,* the court sustained the award for mental anguish, not because the economic injury was inflicted intentionally, but because it was inflicted upon the plaintiff personally. *See Reinhardt,* 516 So.2d at 511. "Where the injury is committed under circumstances of insult or contumely, mental suffering may be recoverable." *Id.*

▇ The Texas Supreme Court has not yet embraced the *Reinhardt* rationale, but it has specifically commended the bench and bar to compare the Alabama court's analysis with dicta found in *Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115 (Tex.1984) (stating that mental anguish is recoverable for "willful tort, willful and wanton disregard, or gross negligence"). *See Likes,* 962 S.W.2d at 497. We find *Reinhardt* to be persuasive. Accordingly, we hold that where a claim of mental anguish is based solely upon property damage resulting from gross negligence, recovery is contingent upon evidence of some ill-will, animus, or design to harm the plaintiff personally. We believe this rationale is more consistent with the general principle that emotional distress is not usually recoverable as an element of property damages unless an improper motive is involved. *Blagrove,* 934 P.2d at 1276.

▇ Only William Tonn was present when the explosion occurred and, although he was slammed against a mirror by the force of the blast, he was not physically injured. The evidence shows appellants were grossly negligent in their operation and maintenance of the cavern, and that appellees experienced frustration, depression, anxiety, sorrow, and anger over the destruction of their property. Appellants' conduct was unconscionable, however, appellees have presented no evidence to suggest appellants actions were motivated by animus, hostility, malevolence, or ill-will. Without this additional element, the presence of gross negligence alone is not sufficient to support an award for mental anguish arising solely from

damage to property. Accordingly, we sustain appellants' twelfth, thirteenth, twenty-sixth, and twenty-seventh points of error. In light of our holding, we need not address appellants' twenty-eighth, twenty-ninth, forty-second, forty-third, forty-fourth, or forty-fifth points of error.

## VII. PREJUDGMENT INTEREST

▇ In their forty-sixth point of error, appellants contend the trial court erred in calculating the prejudgment interest. Because no notice of claim was filed, appellants argue the trial court should have commenced its calculations of prejudgment interest 180 days after appellees filed suit.

When this suit was commenced, Article 5069–1.05, Section 6(a) of the civil statutes provided:

> Judgments in wrongful death, personal injury, and property damage cases must include prejudgment interest. Except as provided by Subsections (b), (c), and (d) of this section, prejudgment interest accrues on the amount of the judgment during the period beginning on the 180th day after the date the defendant receives written notice of a claim or on the day the suit is filed, whichever occurs first, and ending on the day preceding the date judgment is rendered.

*See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 3, § 1, 1987 Tex. Gen. Laws 1, 51 (formerly codified at TEX.REV.CIV. STAT. art. 5069–1.05, § 6). Appellees contend the reference to 180 days applies only to a notice of claim, not the filing of the suit.

We agree with appellees and hold that under the terms of the statute prejudgment interest should be calculated beginning *either* 180 days after receipt of a notice of claim *or* on the day suit is filed, whichever occurs first. *See* John T. Montford and Will G. Barber, *1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System,* 25 HOUS. L.REV. 59, 103–04 (1988) (explaining in hypothetical number one that where notice of claim is given 60 days prior to filing of suit, prejudgment interest should be calculated from the day the suit was filed). When there is no

notice of claim, prejudgment interest is calculated from the day the suit was filed, not 180 days after the suit was filed. *See Hughes v. Thrash,* 832 S.W.2d 779, 787 (Tex.App.-Houston [1st Dist.] 1992, no writ).

Accordingly, we overrule appellants' forty-sixth point of error.[31]

## VIII. APPELLEES' CROSS-POINTS

■ Appellees raise seven cross-points of error. In their first point of error, appellees/cross-appellants contend the trial court erred in applying the statutory cap on punitive damages. Because appellees neither adequately brief their contention, nor indicate with argument and authorities, the specific error which the trial court is alleged to have committed, we find they have waived their point of error. *See* TEX.R.APP. P. 38.1(h); *Johnson v. Odom,* 949 S.W.2d 392, 394 (Tex. App.-Houston [14th Dist] 1997, pet. denied); *Rauscher Pierce Refsnes, Inc. v. Great Southwest Sav., F.A.,* 923 S.W.2d 112, 117 (Tex.App.-Houston [14th Dist.] 1996, no writ). Accordingly, appellees' first cross-point is overruled.

### A. Intentional Nuisance

In their second cross-point, appellees contend the statutory cap is not applicable because appellants committed an intentional tort. As previously discussed, the jury found appellants acted with malice. The jury also found the cavern had become a permanent nuisance in that it would continue to substantially interfere with the plaintiffs' use and enjoyment of their property. Appellees claim the combination of malice and permanent nuisance constitute an intentional tort and that the cap, therefore, does not apply in this case.

Because the jury's finding of malice is not supported by evidence, we need not reach the merits of appellees' contention. Accord-

ingly, we overrule appellees' second cross-point.

### B. Constitutionality of the punitive damages cap

Appellees contend in their third cross-point that the cap, as applied in this case, infringes upon the open courts, due course of law, and trial by jury provisions of the Texas Constitution.[32] Appellees fail to explain, and we fail to see, how the punitive damages cap violates these constitutional provisions.

■ The purpose of punitive damages is not to restore the plaintiff's property or compensate him for his loss. Punitive damages are levied for the *public* purpose of punishment and deterrence. *See Moriel,* 879 S.W.2d at 17. While the plaintiff may be motivated to pursue this public purpose in the hope of securing punitive damages, such proceeds are a windfall and not a matter of right. *See id.* at 17 n. 7 (quoting W. PAGE KEETON, ET. AL, PROSSER AND KEETON ON THE LAW OF TORTS § 2 at 14 (5th ed.1984)). The constitutional provisions cited by appellees serve to protect only *private* rights and interests. Because the statutory cap on punitive damages affects only public punishment interests, it does not infringe upon any constitutional right held by appellees. Accordingly, we overrule appellees' third cross-point.

### C. Waiver

■ In their fourth point of error, appellees claim appellants waived any right to assert the statutory cap on punitive damages because they did not raise the cap in their pleadings. Appellees assert that if a defendant fails to plead an affirmative defense, the defense is waived unless the issue is tried by implied consent or the trial court permits an amendment of the pleadings. *See Petroleum Anchor Equip., Inc. v. Tyra,* 419 S.W.2d 829, 834–835 (Tex.1967). We disagree.

---

31. Appellants' remaining points of error are in regard to plaintiffs who have reached a settlement and have been dismissed from this appeal. Thus, we need not address these points.

32. The constitution specifically provides, "All courts shall be open, and every person for an

injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." *See* TEX CONST. art. I, § 13. It further guarantees, "The right of trial by jury shall remain inviolate." *See* TEX. CONST. art. I, § 15.

To successfully impose an affirmative defense, the proponent must plead and prove his defense. Here, the statutory cap applies to every defendant other than those who specifically intend to cause substantial injury or who commit an intentional tort.[33] If an intentional tort and/or malice is not pled and proven by the plaintiff, the cap automatically applies. Thus, we do not view the statutory cap as an affirmative defense. Because the defendants had nothing to prove, they had nothing to plead. Accordingly, we find appellants had no burden to raise the statutory cap in their pleadings, and we overrule appellees' fourth cross-point.

### D. Prejudgment Interest on Future Damages

In their fifth cross-point, appellees contend the trial court erred in failing to award prejudgment interest on future damages. *See C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 324–27 (Tex.1994). Appellees' future damages were awarded for mental anguish. Because we vacated the mental anguish award, we need not reach this issue. Appellees' fifth cross-point is overruled.

### E. Prejudgment Interest and Actual Damages

■ In appellees' sixth cross-point, they contend the trial court erred by not including prejudgment interest as part of the award of "actual damages" when it calculated the punitive damages cap.

The statute provides that "[p]rejudgment interest may not be assessed or recovered on an award of exemplary damages."[34] Appellees claim, however, they are not seeking interest on punitive damages, but simply

seeking inclusion of prejudgment interest as part of their "actual damages." The result, however, is mathematically the same where, as here, the jury's award greatly exceeds the cap.

If, hypothetically, a plaintiff is awarded damages of $1,000 with a one year period for calculating prejudgment interest, appellees suggest the trial court should calculate the cap in the following manner:

1,000 (damages) × 10% = 100 (prejudgment interest)

1,000 (damages) + 100 (prejudgment interest) = 1,100 (actual damages)

1,100 (actual damages) × 4(cap) = 4,400 (punitive damages)

1,100 (actual damages) + 4,400 (punitive damages) = 5,500 **total recovery**

The method specifically barred by statute is:

1,000 (actual damages) × 4(cap) = 4,000 (punitive damages)

1,000 (actual damages) + 4,000 (punitive damages) = 5,000 (total damages)

5,000 (total damages) × 10% = 500 (prejudgment interest)

5,000 (total damages) + 500 (prejudgment interest) = 5,500 **total recovery**

Using either formula, the plaintiff's total recovery would be the same.

While there is considerable division among the courts of appeals on this issue,[35] we question appellees' ability to circumvent the statutory provisions by simply utilizing a different mathematical formula to produce the same result. Moreover, this court has previously considered this issue and held that prejudgment interest is not included within "actual damages." *See Roberts v. Grande,* 868 S.W.2d 956, 960 (Tex.App.-Houston [14th

**33.** *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 1, 46 (formerly codified at Tex. Civ Prac. & Rem.Code § 41.008).

**34.** *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 1, 46 (formerly codified at Tex. Civ. Prac. & Rem Code § 41.006).

**35.** The Third and Fifth Courts of Appeals have held that prejudgment interest constitutes part of the plaintiff's "actual damages." *See Paramore v. Nehring,* 792 S.W.2d 210, 212 (Tex.App.-Austin 1990, no writ); *Cain v. Pruett,* 938 S.W.2d 152, 158 (Tex.App.-Dallas 1996, no writ). The Second, Fourth, Ninth, and Twelfth Courts of Appeals have held prejudgment interest should not be included in "actual damages." *See Hope v. Allstate Ins. Co.,* 719 S.W.2d 634, 638 (Tex.App.-Fort Worth 1986, writ ref'd n.r.e.); *Benefit Trust Life Ins. Co. v. Littles,* 869 S.W.2d 453, 473 (Tex.App.-San Antonio 1993, writ granted without reference to the merits); *Mobil Oil Corp. v. Ellender,* 934 S.W.2d 439, 470 (Tex.App.-Beaumont 1996), *rev'd in part on other grounds,* 968 S.W.2d 917 (Tex.1998); *Allstate Ins. Co. v. Kelly,* 680 S.W.2d 595, 611 (Tex.App.-Tyler 1984, writ ref'd n.r.e.).

Dist.] 1994, no writ); *Rotello v. Ring Around Products, Inc.*, 614 S.W.2d 455, 463 (Tex.Civ. App.-Houston [14th Dist.] 1981, writ ref'd n.r.e.). We see no reason to overrule our earlier holdings. Accordingly, we overrule appellees' sixth cross-point.

## F. Calculation of the Punitive Damage Award

■ In their final cross-point, appellees contend the court erred when it computed their portion of the punitive damages award. The combined damages of all the plaintiffs was $5,395,400. The jury awarded total punitive damages of $46,000,000. Rather than granting each plaintiff four times his actual damages, the trial court reduced the total punitive damages to $21,581,600 (or four times $5,395,400). Using the percentage computed by the jury, the court then apportioned the $21,581,600 among the plaintiffs. As a result, some plaintiffs were awarded slightly more than four times their actual damages; others, like the O'Donnells and Tonns, were awarded slightly less. Appellees contend this procedure was flawed and the trial court did not properly apportion the punitive damage award among the plaintiffs.

This issue, however, is not properly before us. It is well established that "an appellee may complain by cross-point in his brief in the court of appeals, without perfecting an independent appeal, of any error in the trial court *as between appellant and appellee.*" *Donwerth v. Preston II Chrysler–Dodge*, 775 S.W.2d 634, 639 (Tex.1989) (emphasis added). Here, however, appellees complain of an error that is between appellees and their former co-appellees.

Citing *Warren v. Triland Investment Group*, 779 S.W.2d 808 (Tex.1989) as authority, appellees contend the matter may be properly raised by a cross-point. In that case, Warren sued and obtained a judgment against two defendants, Vista and Triland. Triland appealed. Warren filed cross-points pertaining to his claims against both Vista and Triland. The court of appeals overruled *all* of Warren's cross-points on the ground that those points had to be raised by a separate appeal.

Observing that Triland had not limited its appeal, the Supreme Court, in a *per curiam* opinion, held that (1) Warren was free to present cross-points; (2) the court of appeals' decision conflicted with *Donwerth;* and (3) remanded the cause for further proceedings. The opinion does not comment on the validity of Warren's cross-points pertaining to Vista, and we believe the decision was based on the court of appeals' refusal to consider the cross-points relating to Triland. Thus, we do not believe *Warren* is controlling.

A year after the *Warren* decision, one of our sister courts considered a case in which two plaintiffs, Falcon and INA sued a single defendant, Pollock. *See Sheldon L. Pollack Corp. v. Falcon Indus.*, 794 S.W.2d 380 (Tex. App.-Corpus Christi 1990, writ denied). The trial court entered judgment in favor of Falcon and INA. Pollock appealed. In two cross-points, INA argued, as do the appellees, that the trial court erred in apportioning the damages as between the plaintiffs. After examining the Supreme Court's decisions in *Donwerth* and *Warren*, the court of appeals wrote:

> [N]either of the recent Supreme Court cases dealing with this issue involved cross points raised by one co-appellee against another. In fact, both specifically base their holdings on cross-appeals between an appellant and an appellee.

*Id.*, at 384–85. In deciding INA should have filed a separate appeal, the court concluded it had "no jurisdiction to entertain INA's cross points." *Id.*, at 385. We agree, and finding the same rationale applies here, overrule appellees' seventh cross-point.

Accordingly, we reverse the trial court's judgment, in part, and render judgment in favor of MAPCO. As to MAPCO, appellees take nothing. As to Seminole and Mid–America, we vacate the award for past and future mental anguish. We also vacate the jury's finding of malice. In all other respects, we affirm the trial court's judgment as modified.

Because the award for past and future mental anguish is vacated, the punitive damage cap and prejudgment interest must be recalculated. However, the record before us does not contain the original plea in interven-

tion or the date such instrument was filed, and we cannot ascertain the period of prejudgment interest. Accordingly, we remand this cause to the trial court for recomputation of the judgment consistent with this opinion.