**ARDMORE, INC. f/k/a GHX Incorporated and Star Properties, LLC, Appellants**

v.

**The REX GROUP, INC. d/b/a T–3 Support Services, Inc., Appellee.**

No. 01–11–00328–CV.

Court of Appeals of Texas, Houston (1st Dist.).

April 19, 2012.

Ben A. Baring Jr., Paul J. McConnell,
De Lange, Hudspeth, McConnell & Tib-

bets, L.L.P., Robert A. Jones, Craig W. Saunders, Barlow Jones L.L.P., Richard H. Edelman, Houston, TX, for Appellants.

Katherine T. Garber, James M. Kimbell, Strasburger & Price, L.L.P., Thomas W. Paterson, Susman Godfrey, LLP, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices HIGLEY and BROWN.

## OPINION

LAURA CARTER HIGLEY, Justice.

This appeal concerns whether purchase options in two leases were properly exercised. Appellants, Ardmore, Inc. and Star Properties, LLC, appeal the trial court's grants of summary judgment against them and in favor of appellee, The Rex Group, Inc. In one issue, Star Properties argues that the trial court erred by determining that The Rex Group had timely exercised its option to purchase from Star Properties. In two issues, Ardmore argues that the trial court erred by determining the statute of frauds barred the application of its option to purchase from The Rex Group because (1) the property was identified with reasonable certainty; (2) Ardmore fully performed under the contract; (3) Ardmore partially performed under the contract; and (4) The Rex Group is estopped from asserting the statute of frauds defense. In a cross-appeal, The Rex Group challenges the sufficiency of the evidence to support the trial court's award of attorneys' fees in favor of The Rex Group and against Star Properties.

We affirm, in part, and reverse and remand, in part.

## Background

This lawsuit concerned a dispute over ownership of certain commercial property located in Houston, Texas. There are three parties involved in the suit: Star Properties, the owner of the property; The Rex Group, the lessee of the property; and Ardmore, a sublessee of the property. Both the lease from Star Properties to The Rex Group and the sublease from The Rex Group to Ardmore contain purchase options, exercisable at the end of the lease from Star Properties to The Rex Group. At the end of the lease, The Rex Group attempted to exercise the purchase option in the lease, and Ardmore attempted to exercise the purchase option in the sublease. In turn, Star Properties asserted that The Rex Group's attempt was ineffective, and The Rex Group asserted that Ardmore's attempt was ineffective. The parties brought this litigation seeking to establish their respective claims to ownership of the property.

The commercial property at issue in this case is located along Ardmore Street in Houston, Texas. In 1991, the property in question was owned by Baker Hughes, Inc. and Combustion Engineering, Inc. Combustion Engineering later conveyed its interest in the property to ABB Prospects, Inc. Baker Hughes, Combustion Engineering, and ABB Prospects will be referred to collectively as the "Original Lessors." The Original Lessors entered into a lease agreement with The Rex Group, Inc. in May 1991. The lease was effective until the end of November 1997. During the term of the lease—provided that proper notice was given—The Rex Group was authorized to purchase the property in question for $2,500,000.

The lease also prevented The Rex Group from assigning or subleasing any portion of the property to non-affiliated parties without obtaining the prior written consent of the landlord. Specifically, the lease provided, in pertinent part,

Except for subleases to affiliates or subsidiaries of Tenant [The Rex Group] for which no consent to sublease shall be required by Landlord [the Original Lessors], Tenant may not sublet all or any portion of the Premises without the prior written consent of Landlord. Landlord shall not unreasonably withhold its required consent to a particular subletting provided [certain enumerated conditions exist]. Tenant shall not be relieved of any of its obligations hereunder by reason of any sublease of all or part of the premises.

The lease was amended by agreement of the parties at least seven times. Among other things, the amendments extended the term of the lease to July 2008, and modified the terms of the purchase option. As modified by the sixth amendment, the purchase option section of the lease provided, in pertinent part,

A. In consideration of the mutual covenants herein contained, Landlord grants to Tenant the option to purchase the Premises during the Term for $2,500,000 in accordance with this Section. This option to purchase may not be exercised to be effective at any time or times other than in the month of June, 2008 (the "Effective Month").

. . . .

D. Except as provided in subsection F. below, to exercise such purchase option, Tenant must ... (ii) give Landlord written notice of its intent to purchase at least 90 days prior to the first day of the applicable Effective Month. . . .

The parties agree that, by the terms of these two subsections alone, The Rex Group's deadline to exercise the purchase option was March 3, 2008.

As of 2001, both The Rex Group and Ardmore were subsidiaries of Industrial Holdings Incorporated, and both were operating their businesses in the commercial property subject to the lease. In 2001, Industrial Holdings began negotiations over a merger with T3 Energy Services. One condition of the merger was that Industrial Holdings would sell Ardmore prior to the merger.

As a result, Industrial Holdings approached Ben Andrews and Dan Ahuero, the executives then in charge of Ardmore, about purchasing Ardmore. Andrews and Ahuero agreed but insisted as part of the sale that they be allowed to remain on the leased premises and, if The Rex Group elected to exercise the purchase option in the lease, that they be allowed to purchase a lesser portion of the property.

To that end, The Rex Group entered into a sublease with Ardmore. The sublease provided that it was "subject and subordinate to" the lease. It also recognized that Ardmore was already subleasing a portion of the property. That portion of the property was defined as the "Premises" in the sublease "as more particularly described on *Exhibit A*." Exhibit A consists of the following image:

The sublease gave Ardmore continued use of the Premises along with "the nonexclusive right to use for vehicular and pedestrian access and vehicular parking, any and all driveways, parking areas, pedestrian walkways, and other common or shared areas, including, without limitation, the "Shared Drive" depicted on *Exhibit A.*"

The purchase option in the sublease provided, in pertinent part:

In the event that Sublessor [The Rex Group] elects to exercise the option to purchase the premises covered by the Base Lease (the "Entire Base Lease Premises") in accordance with the terms of such purchase option contained in Section 27 of the Base Lease (the "Purchase Option"), Sublessor shall give Lessors the required written notice of Sublessor's intent to exercise the Purchase Option (the "Exercise Notice") no later than the thirtieth (30th) day ("Sublessor Exercise Deadline") prior to the last day by which the Purchase Option may be timely exercised pursuant to Section 27.-D(ii) of the Base Lease.... Sublessee [Ardmore] shall thereupon be entitled, contemporaneously with Sublessor's acquisition of the Entire Base Lease Premises, to acquire from Sublessor that portion of the Entire Base Lease Premises ("Option Property") as is depicted on the drawing attached hereto as *Exhibit D* ....

The parties agree that the Ardmore's exercise deadline, as defined in the sublease, was February 2, 2008.

Exhibit D consists of the following image:

Both exhibits were prepared by Andrews on behalf of Ardmore. Andrews testified in his deposition that both exhibits were drafted from the same basic drawing. Andrews acknowledged that there were already markings on the basic drawing he used to create the exhibits. Exhibit A defines the premises to be leased, and Exhibit D defines the premises subject to the purchase option. To that end, Andrews testified, Exhibit A contains a line that "more heavily note[s]" the subleased area. The markings added to Exhibit D show what would be subject to the purchase option.

The Original Lessors consented in writing to the sublease on December 13, 2001. In it, the Original Lessors acknowledged that consent was given and provided that the "Sublease shall not diminish or in any way effect the obligations of Lessee [The Rex Group] to Lessor [the Original Lessors] under the Lease and Lessee shall remain primarily liable for the performance of its obligations under the Lease notwithstanding the existence of the Sublease." The consent also provided that

"Lessee and Sublessee [Ardmore] acknowledge and agree that Lessor has executed this Consent solely to evidence its consent to the Sublease and this Consent shall not in any way create any liabilities, obligations or duties on the part of Lessor." It was signed by representatives for the Original Lessors, The Rex Group, and Ardmore.

In 2003, the Original Lessors sold the property and its lease to Star Properties.

On February 7, 2008, The Rex Group sent Star Properties a written notification of its intent to exercise its purchase option under the lease. On February 15, 2008, Star Properties sent The Rex Group a letter, asserting that The Rex Group had failed to timely exercise its purchase option in accordance with the lease as modified by the sublease.

Following The Rex Group's notification of its intent to exercise the purchase option under the lease, Ardmore elected to exercise its purchase option under the sublease. The Rex Group asserted that Ard-

more could not enforce the purchase option on the grounds that the description of the property subject to the sublease's purchase option violated the statute of frauds.

The underlying litigation ensued. The Rex Group brought claims against Star Properties and Ardmore. Star Properties and Ardmore each brought counterclaims against The Rex Group. As those claims pertain to this appeal, each of the parties sought an adjudication of which, if any, of the purchase options were properly exercised. All of the parties ultimately brought motions for summary judgment on the issues.

As a part of its summary judgment evidence, Ardmore presented the affidavit of Ernest Roth, a registered professional land surveyor. Roth testified in his affidavit that he was familiar with the locality of the property subject to the sublease's purchase option, that he "was able to identify and determine the boundaries of the Option Property with reference to the description thereof provided in the sublease and Exhibit D thereto," and that the property could be identified with reasonable certainty. He included with his affidavit a metes-and-bounds description of the property subject to the sublease's purchase option based on the property description.

In a series of rulings on the motions, the trial court determined that The Rex Group had timely exercised its purchase option under the lease and that the description of the property subject to the purchase option in the sublease was rendered unenforceable by the statute of frauds.

The parties submitted the issue of attorneys' fees to a bench trial. The trial court ultimately awarded attorneys' fees in favor of The Rex Group and against Ardmore and Star Properties.

Each of the parties appealed.

## Motions for Summary Judgment

In one issue, Star Properties argues that the trial court erred by determining that The Rex Group had timely exercised its option to purchase from Star Properties. In two issues, Ardmore argues that the trial court erred by determining the statute of frauds barred the application of its option to purchase from The Rex Group because (1) the property was identified with reasonable certainty; (2) Ardmore fully performed under the contract; (3) Ardmore partially performed under the contract; and (4) The Rex Group is estopped from asserting the statute of frauds defense.

### A. Standard of Review

The summary-judgment movant must conclusively establish its right to judgment as a matter of law. *See MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986). Because summary judgment is a question of law, we review a trial court's summary judgment decision de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex.2009).

To prevail on a "traditional" summary-judgment motion asserted under Rule 166a(c), a movant must prove that there is no genuine issue regarding any material fact and that it is entitled to judgment as a matter of law. *See* TEX.R. CIV. P. 166a(c); *Little v. Tex. Dep't of Criminal Justice,* 148 S.W.3d 374, 381 (Tex.2004). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson,* 168 S.W.3d 802, 816 (Tex.2005).

When a party moves for summary judgment on a claim for which it bears the burden of proof, it must show that it is entitled to prevail on each element of its cause of action. *See Parker v. Dodge,* 98 S.W.3d 297, 299 (Tex.App.-Houston [1st

Dist.] 2003, no pet.). The party meets this burden if it produces evidence that would be sufficient to support an instructed verdict at trial. *Id.*

To determine if there is a fact issue, we review the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *See Fielding,* 289 S.W.3d at 848 (citing *City of Keller,* 168 S.W.3d at 827). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002).

When, as here, the parties file cross-motions for summary judgment on overlapping issues, and the trial court grants one motion and denies the other, we review the summary judgment evidence supporting both motions and "render the judgment that the trial court should have rendered." *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex. 2000).

### B. Timeliness of the Notice under the Lease

■ Star Properties acknowledges that, under the terms of the lease alone, The Rex Group's deadline to exercise the purchase option was March 3, 2008. It also acknowledges that The Rex Group sent its written notice of its intent to exercise its purchase option under the lease on February 7, 2008. Star Properties maintains that The Rex Group nevertheless failed to timely exercise the purchase option under the lease because the purchase option under the lease was modified by the purchase option under the sublease to Ardmore.

The Rex Group acknowledges that, under the terms of the sublease purchase option, it had agreed with Ardmore that The Rex Group would submit its notice of its intent to exercise the purchase option by February 2, 2008. The Rex Group maintains, however, that Star Properties was not a party to the sublease and, accordingly, cannot use the notice deadline under the sublease as a basis to claim that The Rex Group's notice was untimely.

The trial court determined that the deadline to exercise the purchase option under the lease was March 3, 2008 and that The Rex Group timely exercised its right to purchase the property.

In making its argument, Star Properties relies on the following facts: The lease required consent of the landlord for subleases with entities that were not affiliates or subsidiaries of The Rex Group. Star Properties signed a written consent in the form of a contract, which incorporated the sublease into the consent. The sublease incorporated the lease into the sublease. The consent was expressly conditioned on the specific terms of the sublease, including, Star Properties argues, the February 2 exercise date for the option.

Based on these facts, Star Properties argues, "Because the consent was a formal contract that expressly incorporated the sublease (which, in turn, expressly incorporated the lease) and was signed by all three ... parties to the lease and sublease, the signing of the consent was tantamount to all three parties also signing the lease and sublease so as to each be mutually bound by the terms of the three agreements that applied to them."

Specific terms from the lease, the sublease, and the consent show that this argument is incorrect. The lease provides that any sublease entered into by The Rex Group will not relieve it "of any of its obligations hereunder by reason of any sublease of all or part of the Premises." The sublease provides that it is "subject and subordinate to" the lease. The con-

sent provides that the sublease "shall not diminish or in any way effect the obligations of [The Rex Group] to [then Original Lessors, now Star Properties] under the Lease" and that the Original Lessors "executed this Consent solely to evidence [their] consent to the Sublease." The plain language of each of these contracts establishes that Star Properties was not a party to the sublease and that the sublease did not modify the lease.

■ Star Properties argues that the provision in the consent stating that the sublease does not diminish or effect the obligations of The Rex Group should not affect our analysis because the purchase option is a right, not an obligation. The Rex Group counters that, while the purchase option may generally be a right, the notice requirement and deadline are obligations. We agree with The Rex Group. Generally, an option in a contract "is a privilege or right." *Faucette v. Chantos,* 322 S.W.3d 901, 907 (Tex.App.-Houston [14th Dist.] 2010, no pet.). But that right can only be exercised by strictly complying with the obligations set out in the contract. *See id.* at 908; *Mensa–Wilmot v. Smith Int'l, Inc.,* 312 S.W.3d 771, 781 (Tex.App.-Houston [1st Dist.] 2009, no pet.). The consent explicitly provides that the sublease would not "in any way effect" The Rex Group's obligations in the lease. No exception is made for the obligations required to exercise the purchase option.

■ Star Properties also argues that allowing the lease and sublease to have separate exercise dates for the purchase option in the lease leads to the conclusion that The Rex Group intended to allow for the breach of the sublease. It further argues that such a conclusion would violate the rules of contract construction because this would mean the sublease was fraudulently induced and, accordingly, invalid. *See Tawes v. Barnes,* 340 S.W.3d 419, 425

(Tex.2011) (holding all provisions of a contract must be given effect so that none is rendered meaningless).

■ Whether the sublease was fraudulently induced, is unenforceable, or allows for an easy breach by The Rex Group is irrelevant to our analysis. "The general rule is that only the parties to a contract have the right to complain of a breach thereof; and if they are satisfied with the disposition that has been made of it and all claims under it, a third person has no right to insist that it has been broken." *Wells v. Dotson,* 261 S.W.3d 275, 284 (Tex.App.-Tyler 2008, no pet.); *see also Allan v. Nersesova,* 307 S.W.3d 564, 571 (Tex.App.-Dallas 2010, no pet.) (holding party must be in privity of contract or beneficiary of contract to have standing to complain about contract). Neither The Rex Group nor Ardmore has asserted that the modified notification date in the sublease was fraudulently induced, rendered the contract unenforceable, or has resulted in a material breach of the contract. Star Properties may not assert this argument on their behalf. *See Wells,* 261 S.W.3d at 284.

We hold that the evidence establishes, as a matter of law, that The Rex Group timely exercised its purchase option under the lease. We overrule Star Properties' sole issue.

## C. Application of the Statute of Frauds to the Purchase Option in the Sublease

In its first issue, Ardmore argues the trial court erred by granting The Rex Group's motion for summary judgment. Both parties' motions for summary judgment focus on whether the statute of frauds bars the application of the purchase option in the sublease and, if it does,

whether any of the exceptions to the application of the statute of frauds also apply.

■ Under the applicable statute of frauds, a contract for the sale of real estate is not enforceable unless it, or a memorandum of it, is in writing and signed by the person to be charged with the contract. TEX. BUS. & COM.CODE ANN. § 26.01(a), (b)(4) (Vernon 2009). For a contract concerning the conveyance of real estate to satisfy the statute of frauds, "the writing must furnish within itself, or by reference to some other existing writing, the means or data by which the particular land to be conveyed may be identified with reasonable certainty." *Wilson v. Fisher*, 144 Tex. 53, 188 S.W.2d 150, 152 (1945). This applies to a purchase option in a contract. *See Matney v. Odom*, 147 Tex. 26, 210 S.W.2d 980, 981–82 (1948) (applying statute of frauds analysis to purchase option in contract). Whether a contract falls within the statute of frauds is a question of law. *Iacono v. Lyons*, 16 S.W.3d 92, 94 (Tex.App.-Houston [1st Dist.] 2000, no pet.).

■ The purpose of a description in a written conveyance is not to identify the land, but to afford a means of identification. *Jones v. Kelley*, 614 S.W.2d 95, 99–100 (Tex.1981). While we apply a strict application of the statute of frauds, we allow for a liberal construction of the words describing the land. *Gates v. Asher*, 154 Tex. 538, 280 S.W.2d 247, 248 (1955).

■ A metes-and-bounds description is not required to satisfy the statute of frauds. *Tex. Builders v. Keller*, 928 S.W.2d 479, 481 (Tex.1996). Similarly, a plat in a recorded property description is not required. *Nguyen v. Yovan*, 317 S.W.3d 261, 269 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). Nor does the description of the property require "[c]onviction beyond all peradventure of doubt."

*Gates*, 280 S.W.2d at 249; *see also Templeton v. Dreiss*, 961 S.W.2d 645, 659 (Tex. App.-San Antonio 1998, pet. denied) (holding mathematical certainty not required). Instead, only proof within "reasonable certainty" is required. *Gates*, 280 S.W.2d at 249.

■ "If enough appears in the description so that a party familiar with the locality can identify the premises with reasonable certainty, it will be sufficient." *Id.* at 248–49. Generally speaking, a property can be identified with reasonable certainty if it identifies the general area of the land and "contains information regarding the size, shape, and boundaries." *Reiland v. Patrick Thomas Props., Inc.*, 213 S.W.3d 431, 437 (Tex.App.-Houston [1st Dist.] 2006, pet. denied); *accord Fears v. Tex. Bank*, 247 S.W.3d 729, 736 (Tex.App.-Texarkana 2008, pet. denied).

■ "[W]hen construing a conveyance, the court does not look at terms in isolation; rather, it must give effect to all parts of the conveyance and construe the document as a whole." *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 789 (Tex.1995). When a contract includes a map of the property to be conveyed as a part of its description of the property, this is included in the analysis of whether the description satisfies the statute of frauds. *Matney*, 210 S.W.2d at 984; *U.S. Enters., Inc. v. Dauley*, 535 S.W.2d 623, 628 (Tex. 1976). "Whether a map is helpful in remedying descriptive defects of the contract depends on whether the missing details are shown on the map." *U.S. Enters.*, 535 S.W.2d at 628.

■ While parol evidence may be considered under certain circumstances, it cannot be used to supply the "essential elements" of the contract. *Wilson*, 188 S.W.2d at 152. In contrast, it can be used

to "explain or clarify the essential terms appearing in the" contract. *Id.*

If it does not sufficiently describe the land to be conveyed, a conveyance of an interest in real property is void and unenforceable under the statute of frauds. *Nguyen*, 317 S.W.3d at 267.

In order to determine if the purchase option under the sublease is barred by the statute of frauds, we must determine if the property to be sold under the sublease is identified with reasonable certainty. *Wilson*, 188 S.W.2d at 152. We begin by noting that the entire property subject to the lease is described by three metes-and-bounds descriptions. The lease identifies the property subject to the lease as the property "described on Exhibit A" of the lease. Exhibit A of the lease is a metes-and-bounds description of three tracts of land.

The sublease expressly incorporated the lease by reference, and made the lease "a part [of the sublease] for all purposes." Additionally, the purchase option in the sublease expressly recognizes The Rex Group's authority to purchase the premises covered by the lease and defines those premises as the "Entire Base Lease Premises." The sublease then allows Ardmore to purchase a portion of the Entire Base Lease Premises, provided that The Rex Group exercises its right to purchase the Entire Base Lease Premises.

The question we must answer, then, is whether the portion of the Entire Base Lease Premises that was a part of the purchase option in the sublease was sufficiently identified. *See Matney*, 210 S.W.2d at 982 (considering whether portion of larger identified property was sufficiently identified).

The sublease identifies the portion subject to its purchase option as "that portion of the Entire Base Lease Premises ... as

is depicted on the drawing attached hereto as *Exhibit D*." Exhibit D is a map of the premises, including designations of the buildings on the premises at the time of the creation of the sublease. There are three main markings on Exhibit D. It contains an irregular loop around certain buildings on the map. It contains a dashed line that intersects the property from Highway 288 to Ardmore Street. It also contains a solid line that follows the same basic path as the dashed line. On either end of the two lines are two arrows that point in the same direction. Next to one of the arrows is a notation that says "property covered by option."

The Rex Group focuses on the irregular loop and the arrows on the map, arguing that these drawings are too vague to identify the property subject to the sublease's purchase option. Ardmore, in contrast, focuses on the solid line and arrows on the map, arguing this is sufficient to satisfy the statute of frauds. We hold that Ardmore's explanation of the markings on Exhibit D is supported by the record.

Andrews, one of the representatives for Ardmore, prepared Exhibit D to the sublease. In his deposition, Andrews testified that he prepared both Exhibit A and Exhibit D. He further testified that both exhibits were drafted from the same basic drawing. Andrews acknowledged that there were already markings on the basic drawing used to prepare the exhibits. Exhibit A defined the premises to be leased, and Exhibit D defined the premises subject to the purchase option. To that end, Andrews testified, Exhibit A contains a line that "more heavily note[s]" the subleased area. The markings added to Exhibit D showed what would be subject to the purchase option.

This testimony is borne out by a review of the two exhibits. Both exhibits contain the irregular loop and the dashed line.

Exhibit A adds the heavier line, which follows the basic path of the irregular loop. It also adds some shaded areas with arrows indicating that the shaded areas were a shared drive. In contrast, Exhibit D adds the solid line, which follows the same basic path of the dashed line. It also adds the arrows at the top and bottom of the solid line and the notation "property covered by option."

While Andrews's testimony is parol evidence, it falls within the exception of when parol evidence can be considered. *See Wilson*, 188 S.W.2d at 152 (holding parol evidence can be used to "explain or clarify the essential terms appearing in the contract"); *see also David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex.2008) (per curiam) (holding when contract contains ambiguity, courts can admit extraneous evidence to determine true meaning of contract).[1] Because there were multiple markings on Exhibit D, Andrews's testimony may be used to clarify the meaning of the markings.

We are left, then, with a map of the Entire Base Lease Premises with a line running through the parking lot, midway between two groups of buildings, and notations indicating that the property covered by the purchase option is everything to one side of this line. To put it another way, the property subject to sale under the sublease can be identified with a metes-and-bounds description—by reference to the property description in the lease, which contains a metes-and-bounds description of the entire premises—on three out of four of its borders. Whether the

fourth border—the hand-drawn line running through the premises—can be identified with reasonable certainty determines whether the purchase option under the sublease satisfies the statute of frauds.

The Rex Group argues that the map is too ambiguous to identify the property subject to the sublease's purchase option with reasonable certainty. To support this argument, The Rex Group relies on *U.S. Enters.*, 535 S.W.2d at 623 and *Guenther v. Amer-Tex Constr. Co.*, 534 S.W.2d 396 (Tex.Civ.App.-Austin 1976, no writ).

In *U.S. Enterprises*, the Texas Supreme Court recognized that, when a map is included as a part of a property description, it "becomes a part of the written contract and can aid a defective written description if the map contains enough necessary descriptive information." 535 S.W.2d at 628. In that case, the written description of the land to be sold was 10 tracts of land out of three identified surveys in Wise County, Texas. *Id.* at 625. The 10 tracts were generally identified in the written description. *Id.* The written description also said that the tracts—other than certain identified tracts—were identified on a map marked as Exhibit A. *Id.*

The issue for the court to resolve was whether two of the 10 tracts were properly identified in the contract, including the map. *Id.* at 626–27. It was undisputed that, without the map, the two tracts were not sufficiently identified. *Id.* at 628. The court held that the map did not correct this inadequacy because there was nothing on the map "which supplies any aid as to

---

1. While The Rex Group argues that the irregular loop formed the property subject to the sublease's purchase option, it presented no evidence that this in any way reflected the intent of the parties. Accordingly, whether this alternative interpretation satisfies the statute of frauds is not before us. *See Travis v. City of Mesquite*, 830 S.W.2d 94, 100 (Tex.

1992) (holding appellate courts may only review issues "actually presented to and considered by the trial court"); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 677 (Tex.1979) (holding that trial court may not grant summary judgment on ground not presented by movant in writing).

the name or location of" the tracts at issue. *Id.* U.S. Enterprises sought to establish by parol evidence that the two tracts were located on the map, but the court held that—even if this were a proper use of parol evidence—the proffered evidence did not show *where* on the map the two properties were. *Id.* at 629. Accordingly, even if admissible, it was insufficient. *Id.*

In *Guenther*, the only reference to the land to be conveyed was a map. 534 S.W.2d at 396–97. The map referenced two roads, two fences, and a utility line to establish the boundaries of the land. *Id.* One of the fences bordered a park. *Id.* The court recognized that the two roads and the fence bordering the park could likely be found. *Id.* at 398. It held, however, that the type of utility line—such as electric, telephone, or gas—forming one of the borders was not identified. *Id.* Even if this utility line could be identified, the last border was a fence that was not identified in any way. *Id.* Because there was no indication of the location of the fence, the size of the property or the length of the borders, there was no information to fill in what would be needed to identify this last border either. *See id.*

We find this case to be easily distinguishable from *U.S. Enterprises* and *Guenther*. Unlike *U.S. Enterprises*, the map consists only of the property subject to the lease's purchase option and the portion of that property that is subject to the sublease's purchase option is demarcated. Unlike *Guenther*, three of the four boundaries can be identified with metes-and-bounds descriptions, leaving only one line that is not identified at that level of detail.

We hold that this last line on Exhibit D of the sublease can be identified with reasonable certainty. There is enough detail on the map—including designations of buildings on the premises—to show fairly clearly where this last line falls. While the location of the line is not identified with exact precision, this is not required to satisfy the statute of frauds. *See Gates*, 280 S.W.2d at 249 (holding "[c]onviction beyond all peradventure of doubt" is not required); *Templeton*, 961 S.W.2d at 659 (holding mathematical certainty is not required).

Additionally, as Ardmore points out, the property subject to the sublease's purchase option has been identified by a land surveyor. Roth, the surveyor, testified in his affidavit that he was familiar with the locality of the property subject to the sublease's purchase option, that he "was able to identify and determine the boundaries of the Option Property with reference to the description thereof provided in the sublease and Exhibit D thereto," and that the property could be identified with reasonable certainty. He included with his affidavit a metes-and-bounds description of the property subject to the sublease's purchase option based on the property description.

 The Rex Group argues that Roth's affidavit and attached metes-and-bounds description cannot be considered because after-the-fact parol evidence cannot be used to cure an inadequate description in a contract. It is true that, the information required to satisfy the statute of frauds must be in the document "or by reference to some other *existing* writing." *Wilson*, 188 S.W.2d at 152 (emphasis added). It is also true that parol evidence cannot be used to supply the essential requirements to satisfy the statute of frauds. *Id.* at 57, 188 S.W.2d at 152. Roth's affidavit and attached metes-and-bounds description do not function in violation of either of these rules, however. Instead, they function to show "that a party familiar with the locality can identify the premises with reasonable certainty." *Gates*, 280 S.W.2d at 248–49; *see also Dix-*

*on v. Amoco Prod. Co.*, 150 S.W.3d 191, 195 (Tex.App.-Tyler 2004, pet. denied) (holding testimony of surveyor can be admitted to show that property can be identified with reasonable certainty); *Foster v. Bullard*, 496 S.W.2d 724, 733 (Tex.Civ. App.-Austin 1973, writ ref'd n.r.e.) (holding parol evidence can be considered to show property can be identified with reasonable certainty).

The Rex Group included evidence of its own surveyor, who asserted in an affidavit that the property subject to the sublease cannot be identified with reasonable certainty. At best, however, this creates a fact issue. We must review the evidence in the light most favorable to Ardmore, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *See Fielding*, 289 S.W.3d at 848 (citing *City of Keller*, 168 S.W.3d at 827). Additionally, we must indulge every reasonable inference and resolve any doubts in Ardmore's favor. *See Sw. Elec. Power Co. v. Grant*, 73 S.W.3d at 215. The affidavit of The Rex Group's surveyor does not overcome the affidavit of Ardmore's surveyor. As a result, The Rex Group was not entitled to judgment as a matter of law.

In this way, this case is similar to *W. Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248 (Tex.App.-Austin 2002, no pet.). In *West Beach Marina*, the property at issue was identified by "a hand-drawn sketch superimposed on an elevation map that indicates the location of" the relevant property. *Id.* at 265. Both parties presented testimony from a surveyor. *Id.* at 266. During a bench trial, one surveyor asserted he could not identify the property with reasonable certainty, while the other surveyor testified that he could identify it and created a metes-and-bounds description of the property. *Id.* The court of appeals held that the trial court did not err in relying on the other surveyor's testimony and accepting that the property could be identified with reasonable certainty. *Id.*

The same reasoning is applicable here. The property description contained with the sublease is not so vague or ambiguous as to render its boundaries indeterminable. Additionally, the record shows that a surveyor, using the information contained in or referenced by the sublease, was able to identify the property with reasonable certainty. Accordingly, we hold that the trial court erred by determining, as a matter of law, that the property subject to the sublease's purchase option could not be identified with a reasonable certainty.[2]

In the remainder of its first issue, Ardmore argues that, if we reverse the trial court's summary judgment in favor of The Rex Group, we must also reverse the trial court's award of attorneys' fees in favor of The Rex Group. The Rex Group acknowledges this is the law, and we agree. *See Bd. of Med. Exam'rs v. Nzedu*, 228 S.W.3d 264, 276 (Tex.App.-Austin 2007, pet. denied) (holding that reversal of declaratory judgment act claim also requires reversal of award of attorneys' fees for new determination of equitable and just award). Accordingly, we reverse the trial court's award of attorneys' fees in favor of The Rex Group and against Ardmore.

We sustain Ardmore's first issue.

---

**2.** Because we hold that the trial court could not determine as a matter of law that the statute of frauds barred the enforcement of the purchase option in the sublease, we do not reach Ardmore's remaining arguments concerning the application of certain exceptions to the statute of frauds. *See* Tex.R.App. P. 47.1 (requiring appellate courts to address every issue raised and *necessary* to final disposition of the appeal).

■ Ardmore's second issue concerns whether the trial should have granted summary judgment in favor of Ardmore and against The Rex Group.

When a party moves for summary judgment on a claim for which it bears the burden of proof, it must show that it is entitled to prevail on each element of its cause of action. *See Parker,* 98 S.W.3d at 299. When, as here, the parties file cross-motions for summary judgment on overlapping issues, and the trial court grants one motion and denies the other, we review the summary judgment evidence supporting both motions and "render the judgment that the trial court should have rendered." *FM Props.,* 22 S.W.3d at 872.

Ardmore's counter-petition against The Rex Group seeks specific performance of the purchase option, arguing that it had exercised the purchase option and that it "is ready, willing, and able to complete its purchase of the property." Ardmore argued the same thing in its motion for summary judgment. In its prayer, Ardmore asked the court to "enter judgment decreeing specific performance, requiring [The Rex Group] to convey the property described in Exhibit 'D' to the sublease to [Ardmore] in accordance with the terms and conditions of the sublease."

Ardmore's only summary judgment evidence, however, concerned whether the purchase option was unenforceable under the statute of frauds. Its motion for summary judgment did not present any legal authority for what was required to entitle it to specific performance of the purchase option. Nor did it present any evidence to establish that it had done everything required to entitle it to specific performance. *See* TEX.R. CIV. P. 166a(c) (requiring movant to establish with competent evidence that it is entitled to judgment as a matter of law). Accordingly, we hold that the record does not permit us to render judg-ment in favor of Ardmore and against The Rex Group.

We overrule Ardmore's second issue.

### Bench Trial on Attorneys' Fees

In a cross-appeal, The Rex Group challenges the sufficiency of the evidence to support the trial court's award of attorneys' fees in favor of The Rex Group and against Star Properties.

### A. Standard of Review

■ In conducting a legal sufficiency review of the evidence, we consider all of the evidence in a light favorable to the verdict and indulge every reasonable inference that supports it. *City of Keller,* 168 S.W.3d at 827. We consider evidence favorable to the finding if a reasonable factfinder could consider it, and disregard evidence contrary to the finding unless a reasonable factfinder could not disregard it. *Id.* at 827. In conducting a factual sufficiency review, we consider all of the evidence supporting and contradicting the challenged finding and set it aside only if the evidence is so weak as to make it clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *see also Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). In an appeal of a judgment rendered after a bench trial, we may "not invade the fact-finding role of the trial court, who alone determines the credibility of the witnesses, the weight to give their testimony, and whether to accept or reject all or any part of that testimony." *Volume Millwork, Inc. v. W. Hous. Airport Corp.,* 218 S.W.3d 722, 730 (Tex.App.-Houston [1st Dist.] 2006, pet. denied).

### B. Analysis

■ In the bench trial on the issue of attorneys' fees, The Rex Group presented

evidence that it had incurred $209,552 in attorneys' fees. It also presented expert testimony concerning whether the fees were reasonable and necessary based on *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex.1997) (quoting Tex. Disciplinary Rules Prof'l Conduct R. 1.04, *reprinted in* TEX. GOV'T CODE ANN. tit. 2, subtit. G, app. A (Vernon Supp. 2011) (Tex. State Bar R., art. X, § 9)).

During the bench trial, it was established that Star Properties had incurred about $120,000 in attorneys' fees for about 410 hours of work through the time that summary judgment was rendered against it. Star Properties' attorney then acknowledged to the trial court that it was "in no position to deny that [$]120,000 is reasonable in the case."

Ultimately, the trial court awarded $85,000 in attorneys' fees in favor of The Rex Group and against Star Properties. On appeal, The Rex Group argues the trial court abused its discretion by only awarding $85,000 in attorneys' fees based on Star Properties' attorney's statement. Specifically, The Rex Group argues,

> Thus the record contains undisputed evidence that Rex's reasonable and necessary attorneys' fees against Star were at least $120,000. This conclusion in turn triggers a series of subsidiary conclusions: (1) that as a matter of law the evidence contradicts the trial court's implied finding that only an $85,000 fee was reasonable and necessary; (2) that the finding is against the great weight and preponderance of the evidence; and (3) that the trial court abused its discretion in setting the fee at $85,000.

■ The Rex Group does not cite to any legal authority to show why the statement made during closing arguments by Star Properties' attorney would constitute evidence or would otherwise be bind-

ing on the trial court. Star Properties' attorney's statement does not constitute a judicial admission. "A judicial admission results when a party makes a statement of fact which conclusively disproves a right of recovery or defense he currently asserts." *Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 740 (Tex.App.-Houston [14th Dist.] 1998, no pet.). The elements for establishing that a statement is a judicial admission are (1) the statement must be made in the course of a judicial proceeding; (2) it must be contrary to an essential fact or defense asserted by the party; (3) it must be deliberate, clear, and unequivocal; (4) it cannot be destructive of the opposing party's theory of recovery or defense; and (5) enforcing the statement as a judicial admission would be consistent with public policy. *Kaplan v. Kaplan*, 129 S.W.3d 666, 669 (Tex.App.-Fort Worth 2004, pet. denied). The public policy concerning judicial admissions is that it would be unjust to permit a party to recover after he has sworn himself out of court by a clear, unequivocal statement. *Id.*

Star Properties' attorney's recognition that it would risk appearing hypocritical arguing it should be entitled to $120,000 in attorneys' fees but that The Rex Group should be entitled to less for work done during the same period is not tantamount to a deliberate, clear, and unequivocal admission that $120,000 is inherently reasonable and necessary. *See id.*

■ Moreover, unsworn statements of counsel generally do not constitute evidence. *See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex.1997); *see also Vaughn v. Tex. Emp't Comm'n*, 792 S.W.2d 139, 144 (Tex.App.-Houston [1st Dist.] 1990, no writ) (holding unsworn attorney's statement does not constitute evidence to support award of attorneys' fees). The Rex Group offers no argument as to why Star

Properties' attorney's statement should be excepted from this rule. Accordingly, we hold that this statement did not preclude the trial court from performing its obligation to determine what were reasonable and necessary attorneys' fees.

We overrule The Rex Group's sole issue.

## Conclusion

We reverse the trial court's grant of summary judgment in favor of The Rex Group and against Ardmore as well as its award of attorneys' fees in favor of The Rex Group and against Ardmore. We affirm the judgment in all other respects. We remand this case to the trial court for further proceedings.